[No. S028339. May 8, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
GREGORY CALVIN SMITH, Defendant and Appellant.

589

592

**COUNSEL**

William M. Goodman, under appointment by the Supreme Court; Topel & Goodman, Ligi Coleen Yee and Jeremy D. Blank for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Dane R. Gillette and Lisa H. Ashley Ott, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

CHIN, J.—A jury convicted defendant Gregory Calvin Smith of murdering (Pen. Code, § 187),[1] raping (§ 261), and kidnapping (§ 207, subd. (a)) Ai Toyoshima, an exchange student from Japan. It found the murder to be in the first degree and under the special circumstances of rape murder and kidnap murder, and that defendant kidnapped the victim for the purpose of rape. (§§ 190.2, subd. (a)(17), 667.8, subd. (a).) The jury also convicted defendant of other crimes committed the same day against other victims, specifically, attempted robbery (§§ 211, 664), first degree burglary (§§ 459, 460), and two counts of felony false imprisonment (§§ 236, 237). As to all counts, it found that defendant personally used a firearm. (§ 12022.5, subd. (a).) The jury found defendant not guilty of sodomy and found not true the related special circumstance allegation of sodomy murder. (§§ 190.2, subd. (a)(17), 286, subd. (c).)

After a penalty trial, the jury returned a verdict of death. The court denied the automatic motion to modify the verdict (§ 190.4) and imposed that sentence. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

## I. Facts

### A. Guilt Phase

#### 1. *Prosecution Evidence*

On June 16, 1989, Ai Toyoshima, a Japanese student who had come to the United States to learn English, went to a movie with some friends, including her boyfriend, Mitsuhiro Fukumoto, another exchange student. She and Fukumoto then went to a park in Los Gatos and, that evening, got on a bus to go home. Defendant entered the bus at the same time. Around 9:00 p.m., Fukumoto got off at his stop, leaving Toyoshima on the bus. Toyoshima got off near an elementary school in San Jose. Defendant followed her.

Defendant accosted Toyoshima and forced her at gunpoint to go to the elementary school, where he raped her. While raping her, he shot her in the chest with a Raven Arms .25-caliber semiautomatic pistol.

After shooting Toyoshima, defendant attempted to steal a car parked in front of a nearby liquor store. The store owner, John Ajlouni, tried to stop him. Defendant pointed a gun at Ajlouni, told him to go back into the store, then entered the car. A San Jose police car drove onto the parking lot. Ajlouni told the officers that defendant was trying to rob him and he had a gun. Defendant got out of the car and ran. One of the officers chased him, but he got away.

After fleeing the liquor store, defendant entered the home of Roy and Jean Gritter. He pointed a gun at Roy and said, "I shot someone. I can also shoot you." He said he was looking for a "safe place" inside a home. He stayed for hours, forcing the Gritters to remain at gunpoint. About half an hour after entering the home, defendant made a telephone call to Hilda Ang, the victim's host parent while she was staying in the United States. Ang was concerned because Toyoshima was late coming home. Defendant told Ang, "You know that park down the way from your house, she's there," and hung up. He left the Gritters' house sometime that night.

Ang called the police after receiving the telephone call. A short time later, the police found Toyoshima lying on her back in the school yard, conscious but partially paralyzed. She was dressed but wearing no underwear. She was pale, wet, and cold. It appeared the sprinklers had gone on automatically, drenching her. Paramedics took her to the hospital where, despite emergency medical treatment, she died the next morning.

The cause of death was a gunshot wound to the chest. Delay in treatment and hypothermia caused by her getting wet contributed to her death. The

bullet had passed through a lung, perforated the left subclavian artery and vein, fractured a vertebra, and partially severed the spinal cord, paralyzing her lower body. Sperm was found on vaginal and anal swabs. There was no other physical evidence of forcible sodomy. Some evidence indicated the vaginal swab may have contaminated the anal swab.

Following defendant's arrest two months later on unrelated charges, he confessed to these events to two sheriff's deputies who were with him in a holding cell while waiting for a lineup. He said he was confessing because it was "eating [him] up inside." He also said he "didn't mean to kill her," and he was "trying to rape her" when "he shot her accidentally." He said the "girl was struggling with him as he was trying to rape her," and that "he grabbed her by the throat and started choking her." She stopped struggling, so he put the gun down. He started penetrating her. As he did so, she reached for the gun and a struggle ensued. She tried to kick him in the groin but missed. In the process, the gun discharged. Defendant started to run away but soon returned. The girl was still alive. She asked him to write down a telephone number so he could call for help. He said he did not want to touch anything because he did not want to leave fingerprints, but if she told him the number he would memorize it. She told him a number and, after he "dressed her," he ran away.

Defendant told about his trying to take the car at the liquor store and then entering the couple's house. In the house, he called the number the girl had given him and told the person at the other end that "the girl was bleeding in the park and they should call an ambulance." Eventually, he left the house and managed to elude the police and make his way home, arriving around 3:00 a.m. Defendant said he was not a "violent person," but that rape was a "power trip" for him and that "the power is what got him excited."

Defendant showed the police where he had hidden Toyoshima's underpants in some juniper bushes near the school. The police recovered the underpants, which contained semen. Defendant also described where he had disposed of the gun after he left the Gritters' house. Using this information, the police found the weapon, with the safety on, in a woodshed about two blocks from the Gritters' house. Ballistics testing established that a shell casing found at the scene of the shooting came from that gun, and the bullet from the body could have been fired from the gun. A firearms expert testified that the trigger pull on the gun was about five and one-half pounds, and the gun was fired between 12 and 15 inches from the body.

In defendant's home in San Jose, the police found a knife, a .38-caliber double-barrel derringer, and some ammunition that did not fit the derringer or the gun used to shoot Toyoshima.

## 2. *Defense Evidence*

The defense presented expert testimony relating to the sodomy charge of which the jury acquitted defendant, including that there might have been "contamination from the vagina to the anus." It also presented evidence of police interviews with the Gritters. In addition, defendant testified.

Defendant testified that he had an "evil nature," a portion of himself that he did not like but that had "gotten out of control." "There's a part of me stronger at times, and sometimes I overcome it, but it's there." He sometimes had a "strong battle, and I needed help to defeat it." "[A]fter trying to defeat it for such a long period of time and losing, sometimes winning, and always do [*sic*] what the urge led me to do, sometimes I would beat myself, but sometimes I wouldn't, and after losing the battle [that] night, . . . I attacked Ai Toyoshima."

Defendant said he went outside that evening "to look for a girl," not necessarily to rape her but to see "whatever the situation presents." "[A] strange, funny urge came over me to, like, just go outside and see what happens." He took a gun that was loaded, he said, with only one bullet. He took it to intimidate or scare, but not actually to shoot. He chose that gun because it was small and easy to conceal. He owned another gun for which he had no ammunition, but he did not take that one. He "noticed Ai Toyoshima that night in a vulnerable situation, and all of a sudden that evil urge, almost like adrenaline[,] kicked in" and drove him to follow her. "The urge was so strong and it overcame me, my better judgment." He showed the gun to Toyoshima, but only to scare her. He took her to the park and raped her, holding the gun in his hand. At one point she reached for the gun and kicked at him, and the gun discharged. Defendant denied sodomizing or intending to shoot or kill her.

Defendant admitted trying to take the car to make his escape but said he did not intend to deprive the owner of it permanently. He said he intended to "get rid of the car" as soon as he was safe. He also admitted entering the Gritters' home. He said he was looking for a place to hide. From the house, he called the telephone number that Toyoshima had given him, which he had memorized.

Defendant testified that when he was arrested two months later on a different incident, he confessed freely to these crimes. He wanted to "take the responsibility" for what he had done and also to be stopped from doing "something crazy again," since he could not stop himself. So he gave himself "up on a silver platter." He "told the officers that I wanted to clear

my conscience. I wanted to come clean and [say] that I was sorry for what I had done and that it was an accident. The murder part." He wanted "the truth to be known."

## B. Penalty Phase

### 1. *Prosecution Evidence*

The prosecution presented evidence that defendant committed additional crimes in 1988 and 1989 that had originally been charged with these crimes but later were severed (and, after the death verdict, dismissed).

On September 7, 1988, defendant assaulted a 16-year-old girl as she was walking home from school. He tried to kiss her and put his hand around her throat, threatening to break her neck if she screamed. He tried to force her into some bushes, but a neighbor observed them and called out. Defendant ran away.

On November 13, 1988, defendant entered a woman's apartment as she was watching television, put a knife to her throat, choked her, and threatened to kill her if she screamed. He took about $50 from her purse and left.

On November 21, 1988, defendant, armed with a knife, entered the apartment of the mother of the 16-year-old girl he had earlier assaulted. He put a sock in her mouth, blindfolded her, tied her with telephone wire, raped her, and took between $300 and $325, which had been hidden in a pillow.

On December 7, 1988, a woman observed defendant standing on her apartment patio behind a partially open sliding glass door and holding a semiautomatic handgun. He told her to open the screen door, which was locked. She managed to close the glass door. He demanded that she open that door. Instead, she got on the floor, crawled into her bedroom, and summoned the police.

On December 8, 1988, defendant, armed with a handgun, approached a woman in the garage of her apartment and demanded money. They entered her apartment where she showed him her purse. A friend of hers then arrived. Defendant forced both to lie on the floor while he looked around. He tied both up and later forced the friend into a closet. He blindfolded the woman, took her into the bedroom, hit her in the face, then raped her. At one point, he held the gun to her head and threatened to shoot her. He tied her up again, put her into the closet with her friend, then left, taking $65 to $70 from her purse.

In March 1989, defendant entered a woman's apartment as she was watching television, put a knife to her throat, put his hand over her mouth and nose, and told her not to scream. He forced her onto her bed and tied her hands together. He looked around the house, then raped her and eventually left.

On March 24, 1989, defendant approached a 19-year-old girl who was sitting in her car, stuck a knife through the car window, pointed it at her neck, demanded money, took some from her purse, got into the car by forcing the girl onto the other side, cutting her finger in the process, drove the car several miles, and then dropped her off and left with the car.

On April 14, 1989, defendant stabbed a woman in the abdomen while she was in the laundry room of her apartment complex. The wound entered the liver and injured a major vein. The woman was critically injured and had to endure two surgeries to save her life.

On April 21, 1989, defendant, armed with a gun, approached a 16-year-old girl as she was walking home from high school, threatened to shoot her, forced her to a nearby park, and, when she told him she was having her period, forced her to orally copulate him.

Also on April 21, 1989, defendant robbed two gas station attendants at gunpoint of money in the station cash register.

On April 27, 1989, defendant assaulted a 17-year-old girl in the bathroom of the same high school, put his hand over her mouth, pushed her into a toilet stall, and put a knife to her neck.

On April 28, 1989, defendant grabbed a 16-year-old girl as she was riding a bicycle at the same high school, covered her mouth with his hand, pointed a knife at her, threatened to stab her, forced her to climb a fence, took off her pants and underpants, tied her pants around her face so she could not see, and tried to rape and sodomize her. When someone appeared, he ran away.

On August 13, 1989, defendant approached a 14-year-old girl on a bus and spoke with her. Later, off the bus, he approached and spoke with her again, then held onto her. He choked her and started pulling her towards an apartment garage, telling her that she was lucky because he usually carried a "blade." After a few minutes, the girl managed to break away and escape.

On August 14, 1989, defendant approached a 15-year-old girl outside the same high school, tried to kiss her, grabbed her by the neck, said he had a knife, forced her to a more secluded area, and raped her.

The prosecution also presented evidence of two incidents of violence in jail. In 1990, defendant threw a chair at his defense attorney at the time, Barbara F., hitting her. In 1991, he assaulted another jail inmate, hitting him and rendering him unconscious. Defendant had a conviction in Nevada for credit card fraud. Previously, during defendant's guilt phase testimony, the jury had learned that he also had felony convictions for forgery and possession of stolen property.

Shintaro and Mieko Toyoshima, Ai's parents, testified about the impact of their daughter's death. Ai Toyoshima was 16 years old when she died.

### 2. *Defense Evidence*

The defense presented substantial evidence in mitigation. Various witnesses, including family members, testified about his childhood and adulthood and his family life. Many expressed their love for him and testified that he was good to his family and others. He loved and cared for his twin daughters. Some witnesses testified that defendant expressed remorse for his crimes. Barbara F., his original attorney, the one at whom he had thrown the chair, testified that she thought that life without the possibility of parole would be the appropriate punishment. One witness testified that defendant once helped rescue passengers in a car accident, at some risk to himself.

The defense also presented evidence that before his arrest, there were many suspects in the various crimes, and the victims' descriptions of their assailant varied. It then played to the jury a tape recording of a statement defendant made on August 16, 1989, in which he confessed to these crimes (a different confession than the one presented in the prosecution's case-in-chief). The purpose was to show that defendant did not confess because he had been caught, but because he was truly remorseful.[2]

### II. DISCUSSION

### A. Jury Selection Issues

Defendant contends the court erred in excluding for cause five prospective jurors because of their views on the death penalty, in violation of his state and federal constitutional rights. The applicable law is settled. The trial court may excuse for cause a prospective juror whose views on the death penalty would prevent or substantially impair the performance of that juror's duties. (*People v. Mayfield* (1997) 14 Cal.4th

---

[2]The prosecution presented evidence in rebuttal that after his arrest, and even before he confessed, defendant was a suspect in all of these crimes.

668, 727 [60 Cal.Rptr.2d 1, 928 P.2d 485].) "On appeal, we will uphold the trial court's ruling if it is fairly supported by the record, accepting as binding the trial court's determination as to the prospective juror's true state of mind when the prospective juror has made statements that are conflicting or ambiguous." (*Ibid.*)

▮ We have reviewed the record as to each of the five prospective jurors and find no basis on which to overturn the trial court's rulings. All gave conflicting and sometimes ambiguous statements, but all also made statements supporting the court's findings that their views would at least substantially impair the performance of their duties. The first twice answered in the affirmative when the court asked whether her views would prevent or substantially impair her ability as a juror. The second time, she stated, "I guess I would have to say it would prevent or somehow impair . . . on the knowledge I have right now." The second answered in the affirmative when the district attorney asked whether the knowledge that the case might require a decision on the death penalty would "substantially impair [her] ability to act as a juror in this case." She later told the court that her views "could" interfere with her ability to perform her duty as a juror. The third said, "I always thought I couldn't [return a death verdict], so probably when it came right down to saying that, I probably couldn't." When the court asked whether she would automatically vote against the death penalty, she answered, "Yeah, I think so." The fourth stated, "No," when asked whether she could "ever possibly choose the death penalty." The fifth said he would automatically return a verdict of life without the possibility of parole. When the court asked whether his feelings would substantially impair his ability to follow the law, he responded, "I'm afraid it would."

Defendant cites other statements by these prospective jurors that would have supported keeping them as jurors. The question before us as a reviewing court, however, is whether the evidence supports the actual rulings, not whether it would have supported different rulings. Here the record supports the trial court's findings that these prospective jurors' views would substantially impair the performance of their duties.

▮ Defendant also contends the district attorney committed misconduct during jury selection. In questioning one of the prospective jurors that the court later excused for cause, the prosecutor asked: "You can walk by Tiffany's and you can look in the window and you can meaningfully consider this $15,000 stone and that gold Rolex watch; right? And you can think, well, I'd rather have this one with the rubies in it or that with the stones in it or this beautiful diamond ring. But there is a difference between considering and choosing. Could you ever possibly choose the death penalty?" Defendant contends the question "undermined the seriousness of the

imposition of the death penalty." The contention fails for several reasons. First, defendant did not object, thus making the claim not cognizable on appeal. (*People v. Medina* (1995) 11 Cal.4th 694, 740 [47 Cal.Rptr.2d 165, 906 P.2d 2].) Second, the question merely illustrated the difference between considering and actually choosing; it did not suggest that the penalty decision was no more important than selecting jewelry. The prospective juror responded that she could never choose the death penalty, so she continued to take the penalty decision seriously despite the question. Finally, because the prospective juror did not become an actual juror, defendant suffered no prejudice. This final point also disposes of another of defendant's arguments—that a comment the prosecutor made (over objection) to this prospective juror improperly impugned the integrity of defense counsel. The comment was innocuous but, in any event, no actual juror ever heard it.

Defendant also complains of questions the district attorney asked to determine whether the prospective jurors could actually impose the death penalty if they found it appropriate. Defendant objected to one early question.[3] The court permitted the questions as long as they were conditional, that is, if they contained "the proper 'if's,'" and did not simply ask the prospective jurors to return a death verdict. Accordingly, the prosecutor asked similar questions repeatedly during jury selection. Defendant contends the questions improperly asked the jurors "to commit to return a verdict of death before they heard any of the evidence." We disagree. It would be improper to try to commit the jurors to vote in any particular way. These questions, however, did not do so. They merely sought assurance that the jurors would properly perform their duty and return a death verdict *if* the prosecution proved capital charges beyond a reasonable doubt and they believed the death penalty was appropriate. The questions were proper. (*People v. Riel* (2000) 22 Cal.4th 1153, 1178 [96 Cal.Rptr.2d 1, 998 P.2d 969]; *People v. Fierro* (1991) 1 Cal.4th 173, 209 [3 Cal.Rptr.2d 426, 821 P.2d 1302].)

Defendant also contends the questions were inflammatory. He argues, "Asking a prospective juror if he or she could return a death sentence and then pointing to appellant Smith invited the juror to decide the case based upon emotion and not upon fact." We disagree. The prosecutor's specific reference to defendant "was an acceptable means of impressing upon each prospective juror that the verdict of death would affect a real person who

---

[3]The prosecutor asked: "[I]f I could prove to you beyond a reasonable doubt and to a moral certainty that he's guilty of murder, first degree murder with special circumstances, and based upon the second phase of this trial, the penalty phase, that you thought the death penalty was appropriate, could you then take that system and say, 'Yes, that man, Gregory Smith, he deserves the death penalty,' and vote accordingly; could you do that?"

would be in the courtroom at that time, and sought to elicit whether, under these circumstances, the prospective juror nevertheless would be able to vote for death." (*People v. Samayoa* (1997) 15 Cal.4th 795, 853 [64 Cal.Rptr.2d 400, 938 P.2d 2].)[4]

## B. Denial of Defendant's Motions for New Counsel

█ Three times during trial, defendant expressed concerns outside the presence of the district attorney about the representation he was receiving from his attorney, David Johnson. On the latter two occasions, he asked the court to appoint new counsel to represent him. The court denied both requests. Defendant argues the denials violated his state and federal constitutional rights to counsel.

█ When a defendant seeks new counsel on the basis that his appointed counsel is providing inadequate representation—i.e., makes what is commonly called a *Marsden* motion (*People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44])—the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of inadequate performance. A defendant is entitled to relief if the record clearly shows that the appointed counsel is not providing adequate representation or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result. Substitution of counsel lies within the court's discretion. The court does not abuse its discretion in denying the motion unless the defendant has shown that a failure to replace counsel would substantially impair the defendant's right to assistance of counsel. (*People v. Hart* (1999) 20 Cal.4th 546, 603 [85 Cal.Rptr.2d 132, 976 P.2d 683].)

█ Defendant first complained about his attorney on the second day of the prosecution's guilt phase case-in-chief. He complained about what he considered inadequate cross-examination of prosecution witnesses, but he also said he did not "really want to fire my attorney, because there's no personal conflict." The court told defendant that he had the right to request new counsel and explained what showing he would have to make. It also expressed concern that substitution at that time would "impact the normal, orderly process of the trial that we are now undertaking." The court made no ruling because defendant made no motion, but it made clear that defendant could later move for new counsel if he wished.

---

[4]Defendant also objected as inflammatory to a question whether the prospective juror could "kill that man sitting right there." The court sustained the objection, and the prosecutor rephrased it to refer to returning "a death verdict against that man sitting right there." Because the court sustained the objection, and this particular prospective juror was excused for cause, defendant suffered no prejudice.

Defendant's first actual *Marsden* motion, in which he did seek new counsel, occurred after the jury had reached its guilt verdict and before the penalty phase began. Defendant stated a number of specific complaints about his attorney's representation, and the court allowed the attorney to respond. Defendant also stated, "I think our relationship has broken down." He had no "trust" or "confidence" in counsel and complained that counsel did not follow his advice. The court asked the attorney to ponder whether the relationship had broken down such that he could no longer provide proper representation, but otherwise it found no basis on which to discharge counsel. It explained to defendant that his objections "boil down to differences of opinion as to tactics . . . which are the sole responsibility of" counsel. Defense counsel then stated that, based on what defendant had said, he "can't disagree" that the "relationship [has] broken down to the extent that I can no longer competently represent [defendant]." He asked for more time to consult with other attorneys to decide what he should do in this situation and how much information he should give the court. The court continued the hearing to the next day.

The next day, defense counsel merely submitted the matter without further comment. The court then denied the motion for new counsel in a detailed ruling. It discussed defendant's specific complaints and found them insufficient because tactical decisions are within the "sole prerogative of counsel, and [do] not in any way constitute grounds for dismissal on the basis of incompetency." It found that counsel "was not only entirely competent, but [he] gave [defendant] an excellent representation presented in an understandable way, the only defenses which would be reasonably accepted to the jury. The evidence against the defendant was overwhelming, the record is free of prejudicial error." It also found "that the apparent breakdown of the relationship" was not "controlling," because defendant "could not have reasonably expected, based upon the law and the facts of this matter, defense counsel to have done anything other than what was done to this stage of the proceedings."

Defendant made his second motion for new counsel after the presentation of evidence at the penalty phase and before jury arguments. The court permitted defendant to state further reasons why he believed counsel was providing inadequate representation. The court stated it needed no response from counsel as to all but one complaint because it had had the opportunity to observe counsel in court. It asked counsel to respond to defendant's complaint that he had failed to call certain "character witnesses." Counsel stated it was his judgment that these witnesses would have been insufficiently beneficial to call them, and that in his professional opinion, he presented the best case in mitigation that the circumstances allowed. The court denied the motion.

We find no abuse of discretion. Defendant asserts he "was denied the opportunity to develop a record sufficient for this court to review the error in light of all of the evidence." On the contrary, the court gave defendant full opportunity to air all of his complaints, and counsel to respond to them. Defendant's specific complaints merely showed a disagreement as to tactics, not deficient performance. Disagreement concerning tactics, by itself, is insufficient to compel discharge of counsel. (*People v. Hart, supra,* 20 Cal.4th at p. 604.)

Defendant cites his claim that his relationship with counsel had "broken down" and counsel's statement that he could not disagree that the "relationship [has] broken down to the extent that I can no longer competently represent [defendant]." However, counsel's statement was based on what defendant had told the court and does not itself compel the court to grant new counsel. A defendant may not effectively veto an appointment of counsel by claiming a lack of trust in, or inability to get along with, the appointed attorney. (*People v. Berryman* (1993) 6 Cal.4th 1048, 1070 [25 Cal.Rptr.2d 867, 864 P.2d 40].) Moreover, the trial court need not conclude that an *irreconcilable* conflict exists if the defendant has not tried to work out any disagreements with counsel and has not given counsel a fair opportunity to demonstrate trustworthiness. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1086 [74 Cal.Rptr.2d 121, 954 P.2d 384].) Defendant did not show that defense counsel did anything to cause any breakdown in their relationship. "[A] defendant may not force the substitution of counsel by his own conduct that manufactures a conflict." (*People v. Smith* (1993) 6 Cal.4th 684, 696 [25 Cal.Rptr.2d 122, 863 P.2d 192].)

■ "The denial of a motion to substitute counsel implicates the defendant's Sixth Amendment right to counsel . . . ." (*Bland v. California Dept. of Corrections* (9th Cir. 1994) 20 F.3d 1469, 1475, overruled on other grounds in *Schell v. Witek* (9th Cir. 2000) 218 F.3d 1017, 1024-1025 (in bank); see *People v. Hart, supra,* 20 Cal.4th at p. 603.) On direct review of the refusal to substitute counsel, the Ninth Circuit Court of Appeals considers "the following three factors: '(1) timeliness of the motion; (2) adequacy of the court's inquiry into the defendant's complaint; and (3) whether the conflict between the defendant and his attorney was so great that it resulted in a total lack of communication preventing an adequate defense.' " (*Bland v. California Dept. of Corrections, supra,* at p. 1475; see *Schell v. Witek, supra,* at pp. 1024-1025.) It found, and we agree, that these elements are consistent with California law under *People v. Marsden, supra,* 2 Cal.4th 118, and its

progeny. (*Bland v. California Dept. of Corrections, supra,* at pp. 1475-1476.)[5]

▮▮▮ These factors demonstrate the court acted within its discretion. First, defendant's efforts to replace counsel came during trial. To grant the motion "would have required either a significant delay or a mistrial." (*Hudson v. Rushen* (9th Cir. 1982) 686 F.2d 826, 831.) "It is within the trial court's discretion to deny a motion to substitute made on the eve of trial where substitution would require a continuance." (*Bland v. California Dept. of Corrections, supra,* 20 F.3d at p. 1476.) This is even more true if the motion is made *during* trial. In this case, it is hard to imagine the trial court could have found new counsel who could have prepared for the capital penalty phase quickly enough to proceed with the same jury. Granting defendant's motion would no doubt have necessitated not just a continuance but a mistrial, which would have required selecting a whole new jury. A court may not automatically deny a motion for new counsel during trial no matter what the showing, but it should grant such a motion only when the defendant demonstrates that counsel is truly providing inadequate representation or that a total breakdown in the relationship has occurred that the defendant did not cause.

Second, as we have seen, the court conducted a full inquiry into defendant's complaints. It allowed defendant to express himself fully. Its inquiry was "as comprehensive as the circumstances reasonably would permit." (*Hudson v. Rushen, supra,* 686 F.2d at p. 831.) "The court invited defendant to make a statement, listened to defendant's reasons for desiring new counsel, and found them to be without merit." (*Ibid.*)

Finally, defendant did not make such a compelling showing of a conflict between himself and counsel that the court had to grant the motion. In *Hudson,* after the trial court denied a motion for new counsel, the defendant refused to cooperate with counsel or participate further in the trial and simply remained in his holding cell. (*Hudson v. Rushen, supra,* 686 F.2d at p. 829.) Nevertheless, the reviewing court found no abuse of discretion. "The reason for this complete breakdown was the voluntary conduct of defendant, not any failure by the trial court to adequately inquire into the reasons for the conflict." (*Id.* at p. 831.) "In sum, the record is clear that the trial court

---

[5]The overruling of *Bland v. California Dept. of Corrections, supra,* 20 F.3d 1469, involved the nature of federal court habeas corpus review of state court rulings, a matter not implicated in our direct review of the issue here. (*Schell v. Witek, supra,* 218 F.3d at pp. 1024-1025.) Because we find these three elements consistent with California law, we need not consider whether the Sixth Amendment to the United States Constitution requires them. (Compare *Bland v. California Dept. of Corrections, supra,* at pp. 1475-1476, with *Schell v. Witek, supra,* at pp. 1024-1025.)

provided defendant with repeated opportunities to voice his concerns, and upon considering those concerns reasonably found them to be insufficient to warrant relieving trial counsel. We therefore find no basis for concluding that the trial court either failed to conduct a proper *Marsden* inquiry or abused its discretion in declining to substitute counsel." (*People v. Hart, supra,* 20 Cal.4th at p. 604.)

## C. Guilt Phase Issues

### 1. *Admitting Preliminary Hearing Testimony of a Witness*

Defendant contends the trial court erred in admitting the preliminary hearing testimony of Mitsuhiro Fukumoto, Toyoshima's boyfriend who had been on the bus with her and defendant, in violation of his state and federal constitutional rights to confront and cross-examine witnesses.

The prosecution and defense had arranged to take Fukumoto's preliminary hearing testimony on April 16, 1990, about two months before the rest of the preliminary hearing, so that he could testify before he left the country. He testified that he was a foreign exchange student from Tokyo, Japan, and expected to be in the United States until his graduation from high school in June 1991. The attorney who represented defendant at the time cross-examined Fukumoto at length. At trial in February 1992, the district attorney sought to have Fukumoto's preliminary hearing testimony read to the jury because he was unavailable within the meaning of Evidence Code section 240.

The district attorney represented that he had received a telephone call from Fukumoto's host parent in San Diego saying that Fukumoto had left the country. The court accepted the district attorney's representation as an officer of the court without requiring him to testify formally. The district attorney also offered to call a witness to show that Fukumoto was no longer in the country, partly "to support the fact that the prosecution made a good faith effort to secure the attendance of this witness." He called Grant Cunningham, an investigator for the district attorney's office. Cunningham testified that about six days previously, in an attempt to locate Fukumoto, he had called what the district attorney's records indicated was Fukumoto's telephone number in Japan. He asked to speak to Mitsuhiro Fukumoto. A male voice answered, "Yes, this is me." When defendant objected that the testimony was hearsay, the court admitted it to show what the investigator did, but not for the truth of the matter asserted. The district attorney argued that a "good faith effort" relates to the "information that this witness had available to him," and thus the testimony had a nonhearsay purpose. On

questioning by the court, Cunningham testified that he felt he was unable to compel Fukumoto's presence in court because he was in Japan.

After the hearing, the court found that Fukumoto was unavailable as a witness within the meaning of Evidence Code section 240. Fukumoto's preliminary hearing testimony was then read to the jury.

█ A defendant has a constitutional right to confront witnesses, but this right is not absolute. If a witness is unavailable at trial and has testified at a previous judicial proceeding against the same defendant and was subject to cross-examination by that defendant, the previous testimony may be admitted at trial. (*Barber v. Page* (1968) 390 U.S. 719 [88 S.Ct. 1318, 20 L.Ed.2d 255]; *People v. Enriquez* (1977) 19 Cal.3d 221, 235 [137 Cal.Rptr. 171, 561 P.2d 261, 3 A.L.R.4th 73], disapproved on other grounds in *People v. Cromer* (2001) 24 Cal.4th 889, 901, fn. 3 [103 Cal.Rptr.2d 23, 15 P.3d 243]; Evid. Code, § 1291.) The constitutional right to confront witnesses mandates that, before a witness can be found unavailable, the prosecution must "have made a good-faith effort to obtain his presence at trial." (*Barber v. Page, supra*, at p. 725 [88 S.Ct. at p. 1322], quoted in *People v. Enriquez, supra*, at p. 235; see also *Ohio v. Roberts* (1980) 448 U.S. 56, 74 [100 S.Ct. 2531, 2543, 65 L.Ed.2d 597].) The California Evidence Code contains a similar requirement. As relevant, it provides that to establish unavailability, the proponent of the evidence, here the prosecution, must establish that the witness is absent from the hearing and either that "the court is unable to compel his or her attendance by its process" (Evid. Code, § 240, subd. (a)(4)) or that the proponent "has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process" (Evid. Code, § 240, subd. (a)(5)). The constitutional and statutory requirements are "in harmony." (*People v. Enriquez, supra*, at p. 235.) The proponent of the evidence has the burden of showing by competent evidence that the witness is unavailable. (*People v. Price* (1991) 1 Cal.4th 324, 424 [3 Cal.Rptr.2d 106, 821 P.2d 610].)

█ Defendant does not dispute that if Fukumoto were in Japan, he would have been unavailable. But defendant argues the prosecution showed that he was in Japan only by hearsay, which is not competent evidence. The Attorney General responds that defendant did not object on hearsay grounds to the district attorney's representation that Fukumoto's host parent had told him that Fukumoto had left the country. We disagree. Defendant objected on hearsay grounds repeatedly throughout the hearing. It was clear he was objecting to all hearsay. The court admitted the hearsay evidence merely to show what the prosecution did, but not for the truth of the matter asserted.

The Attorney General also argues that Fukumoto's preliminary hearing testimony that he intended to leave the country in June 1991 was admissible

as a statement of intent to do a future act under Evidence Code section 1250. (See Assem. Com. on Judiciary com., 29B pt. 4 West's Ann. Evid. Code (1995 ed.) foll. § 1250, p. 280 ["[A] statement of the declarant's intent to do certain acts is admissible to prove that he did those acts"]; *People v. Alcalde* (1944) 24 Cal.2d 177, 185-188 [148 P.2d 627].) We need not decide whether the testimony was admissible for that purpose or was sufficient to sustain a finding that he was, in fact, out of the country at the time of trial. This is because the prosecution did not have to prove Fukumoto was actually out of the country. It only had to prove that it had exercised reasonable or due diligence (the terms are interchangeable; *People v. Cromer, supra*, 24 Cal.4th at p. 898) or, as stated in the equivalent federal constitutional language, had made a good faith effort to obtain the witness's presence at trial.

As relevant, Evidence Code section 240 provides two closely related but slightly different ways in which a person may be shown to be unavailable. In this case, the prosecution could either show that Fukumoto was absent "and the court is unable to compel his . . . attendance by its process," i.e., that he was in Japan, *or* that he was absent and it "has exercised reasonable diligence but has been unable to procure his . . . attendance by the court's process." (Evid. Code, § 240, subd. (a)(4), (5).) As this case demonstrates, trying to prove a person is, in fact, outside the country can raise substantial practical difficulties because of the hearsay rule. But the due diligence requirement is different. That requirement focuses on what the proponent of the evidence, here the prosecution, did, that is, whether it made reasonable efforts to obtain the witness. The statements by the host parent and the male voice at the end of the line at the Japanese telephone number were admissible on this question, not to prove the truth of the matter asserted, but to show what efforts the prosecution made to ascertain Fukumoto's whereabouts. At trial, the prosecution and court treated these two portions of Evidence Code section 240 somewhat interchangeably. In its ruling, the court referred to both provisions, although its ultimate finding was that Fukumoto "is a resident of the country of Japan and therefore is not subject to the process of this court to compel his attendance." The court did not specifically find the prosecution had exercised due diligence to try to procure Fukumoto's attendance.

When, as here, the facts are undisputed, a reviewing court decides the question of due diligence independently, not deferentially. (*People v. Cromer, supra*, 24 Cal.4th at pp. 900-901.) In this case, reviewing the record independently, we conclude the prosecution satisfied its burden of showing due diligence. The prosecution obtained three important pieces of information: (1) Fukumoto testified at the preliminary hearing that he was a Japanese national and intended to leave the country several months before the

trial occurred, (2) Fukumoto's host parent told the district attorney that Fukumoto had left the country, and (3) the district attorney's investigator had called the telephone number in Japan that the records showed was Fukumoto's number and heard a voice at the other end say he was Fukumoto. This information may have been legally incompetent, due to the hearsay rule, to show that Fukumoto was actually in Japan. But it sufficed to show that the prosecution made reasonable efforts to locate him and that further efforts to procure his attendance would be futile. The prosecution must take reasonable steps to locate an absent witness, but need not do "a futile act." (*Ohio v. Roberts, supra,* 448 U.S. at p. 74 [100 S.Ct. at p. 2543].) The prosecution did locate Fukumoto, but in Japan, outside the court's jurisdiction. In the functioning world outside the courtroom, people often rely on hearsay and, under the circumstances of this case, the prosecution reasonably did so. The prosecution met its burden of showing due diligence, and the court properly found Fukumoto was unavailable as a witness.[6]

Defendant also argues that the court erred in admitting the preliminary hearing testimony because of the differences between a preliminary hearing and a trial. To admit prior testimony of an unavailable witness, the party against whom it is offered, here the defendant, must not only have had the *opportunity* to cross-examine the witness at the previous hearing, he must also have had "an interest and motive similar to that which he has at the [subsequent] hearing." (Evid. Code, § 1291, subd. (a)(2); see *People v. Zapien* (1993) 4 Cal.4th 929, 974-975 [17 Cal.Rptr.2d 122, 846 P.2d 704].) Defendant argues that a defendant has less incentive to cross-examine at the preliminary hearing than at trial. However, we have routinely allowed admission of the preliminary hearing testimony of an unavailable witness. (E.g., *People v. Zapien, supra,* at p. 975.) Here, defendant had even greater incentive to cross-examine Fukumoto at the preliminary hearing than is normally the case. The whole point of the early testimony was to allow Fukumoto to testify before he left the country. At that time, defendant knew the witness would likely be unavailable at trial, and the prosecution would seek to use the preliminary hearing testimony.

Defendant finally argues that defense counsel failed to ask certain questions while cross-examining Fukumoto. This argument can always be made, as one can always think of additional questions. However, it is the opportunity and motive to cross-examine that matters, not the actual cross-examination. "As long as defendant was given the opportunity for effective cross-examination, the statutory requirements were satisfied; the admissibility of

[6]Defendant has never argued that, and hence we do not decide whether, assuming Fukumoto was in Japan, the prosecution was required to do more to procure his attendance, such as request that he come voluntarily to testify. (Cf. *People v. Sandoval* (2001) 87 Cal.App.4th 1425, 1440-1441 [105 Cal.Rptr.2d 504].)

this evidence did not depend on whether defendant availed himself fully of that opportunity." (*People v. Zapien, supra,* 4 Cal.4th at p. 975.) Accordingly, we find no error in admitting Fukumoto's preliminary hearing testimony.

### 2. *Other Evidentiary Issues*

#### a. *Evidence of the victim's medical treatment*

■ Over defense objection, the court permitted the doctor who treated Toyoshima at the hospital to testify about her condition and the treatment she received before she died. Defendant contends the evidence was irrelevant and, even if relevant, was unduly prejudicial. The district attorney offered the testimony, in conjunction with the autopsy evidence, to show "that she died as a result of a combination of several different factors." The court found the evidence relevant and that its probative value outweighed its prejudicial effect.

■ A determination of relevance and undue prejudice lies within the discretion of the trial court, and a reviewing court reviews that determination for abuse of discretion. (*People v. Rowland* (1992) 4 Cal.4th 238, 264 [14 Cal.Rptr.2d 377, 841 P.2d 897].) ■ We find no abuse of discretion. The evidence was not of great significance, but it had some relevance. Evidence of the efforts to save Toyoshima's life helped the jury to understand how and why she died. For example, the doctor testified that hypothermia and bleeding over time were significant factors in her death, which meant that the delay in giving her care greatly lessened her chances of survival. That evidence was, in turn, relevant to help the jury to evaluate the significance of defendant's delay in calling her host parent. The evidence did not have great probative value, but we also see little prejudicial effect. Defendant claims the testimony was "sensational," but it was not. It was merely a factual recitation, unaccompanied by photographs or other visual images, of her condition and the efforts to save her. The jury would certainly expect the doctor to make extensive efforts to save her, as he did. We see nothing that would inflame the jury.

Moreover, any error would have been harmless. Defendant admitted kidnapping and raping Toyoshima and shooting her during the rape. Because defendant was the actual killer, intent to kill was not an element of the felony-murder special circumstances. (*People v. Anderson* (1987) 43 Cal.3d 1104, 1147 [240 Cal.Rptr. 585, 742 P.2d 1306].) Thus, defendant essentially confessed to her first degree felony murder and the kidnapping and rape special circumstances. The only truly contested issue regarding the charges

involving Toyoshima was whether he sodomized her. The jury *acquitted* him of sodomy and found not true the related sodomy special circumstance. This shows the jury considered the evidence dispassionately in reaching its verdict. The challenged evidence would clearly have been admissible at the penalty phase even if not at the guilt phase (*People v. Hovey* (1988) 44 Cal.3d 543, 576 [244 Cal.Rptr. 121, 749 P.2d 776]), thus obviating any possible prejudice at that phase.

### b. *Evidence that defendant owned a derringer and ammunition*

Over defense objection, the court admitted evidence that the police found in defendant's house a derringer and ammunition that fit neither the murder weapon nor the derringer. Defendant contends the court erred under *People v. Riser* (1956) 47 Cal.2d 566 [305 P.2d 1] because the evidence established that neither the derringer nor the ammunition was used in the killing. In *Riser*, we held that "[w]hen the prosecution relies . . . on a specific type of weapon, it is error to admit evidence that other weapons were found in his possession, for such evidence tends to show, not that he committed the crime, but only that he is the sort of person who carries deadly weapons." (*Id.* at p. 577.) The Attorney General responds, first, that defendant did not separately object to the ammunition. We disagree. Reasonably viewed, defendant's objection extended to both items. The major discussion at trial involved the derringer, but when the court admitted that evidence, admission of the ammunition was a logical consequence. When the court said the ammunition would come in as well as the derringer, defendant did not renew his objection, but the court no doubt understood the original objection extended to both.

On the merits, we find no error. This evidence did not merely show that defendant was the sort of person who carries deadly weapons, but it was relevant to his state of mind when he shot Toyoshima. In his confession and opening statement to the jury, defendant claimed the shooting was an accident and he did not intend to kill her.[7] In his later testimony, he said he took the gun to intimidate but not to shoot, and he chose the murder weapon

---

[7]Although intent to kill was not an element of any of the charges, because defendant always denied such intent, it made sense for the defense to raise the issue even at the guilt phase. Placing defendant in as good a light as possible could only help the defense when the jury considered the various charges. Moreover, given the confession and the rest of the evidence, conviction of capital charges was highly likely, if not a foregone conclusion, even if the exact convictions were uncertain. For this reason, the defense could reasonably have wanted to use the guilt phase to start presenting its case in mitigation. (See *People v. Kelly* (1992) 1 Cal.4th 495, 520-523 [3 Cal.Rptr.2d 677, 822 P.2d 385] [counsel may reasonably consider the trial as a whole in deciding what tactics to employ at a particular phase].) Presence or absence of intent to kill was obviously relevant to the penalty determination. ·

because it was small and easy to conceal. Evidence that he possessed another small, easily concealed but unloaded gun and no ammunition that fit it, and that he chose instead to take a loaded gun, was relevant to defendant's credibility on this point. An unloaded gun fully serves to intimidate; a loaded gun is necessary only to actually shoot. Thus, although the ammunition and derringer were not used in the killing, "[t]heir circumstantial relevancy . . . seems clear," and they were, accordingly, properly admitted. (*People v. Lane* (1961) 56 Cal.2d 773, 785 [16 Cal.Rptr. 801, 366 P.2d 57]; see also *People v. Neely* (1993) 6 Cal.4th 877, 896 [26 Cal.Rptr.2d 189, 864 P.2d 460].)

### c. *Cross-examination of defendant*

■ Defendant contends that the trial court erroneously permitted the district attorney to cross-examine him in certain respects. "When a defendant voluntarily testifies, the district attorney may fully amplify his testimony by inquiring into the facts and circumstances surrounding his assertions, or by introducing evidence through cross-examination which explains or refutes his statements or the inferences which may necessarily be drawn from them." (*People v. Cooper* (1991) 53 Cal.3d 771, 822 [281 Cal.Rptr. 90, 809 P.2d 865].) Under this standard, we find no error.

Defendant first complains that the district attorney questioned him about two rapes that postdated the charged crimes. On direct examination, defendant testified that he had freely confessed to ease his conscience, to be stopped from doing "something crazy again," and to let the truth be known. Whether he confessed solely for these noble reasons, or because he had been caught and was trying to make the best out of a bad situation, was relevant to the motivation behind, and hence to the credibility of, the confession and defendant's subsequent testimony. The credibility of defendant's confession and testimony was, in turn, relevant to a number of issues at trial. Although defendant essentially confessed to some of the charges, he did not confess to every element of every charge. He denied sodomizing Toyoshima. He denied intending to deprive the car owner of the car permanently, which, if believed, would negate guilt of the attempted robbery charge. (See *People v. Guerra* (1985) 40 Cal.3d 377, 385-386 [220 Cal.Rptr. 374, 708 P.2d 1252].) He implicitly denied entering the Gritters' home with the intent to commit false imprisonment or any other crime, which, if believed, would negate guilt of the burglary charge. (*People v. Frye* (1998) 18 Cal.4th 894, 954 [77 Cal.Rptr.2d 25, 959 P.2d 183].) He also claimed he did not intend to kill Toyoshima; accordingly, although intent to kill was not legally required for any of the charges, the prosecution was also entitled to challenge this assertion.

For these reasons, the district attorney properly cross-examined defendant on his motivation to confess. At one point, he sought permission to ask

questions about whether defendant had confessed only after he had committed two recent rapes and had already been arrested. He argued that these questions were relevant to show that defendant was merely "trying to put things in the best light, and that's the reason that he made this self-serving statement, that confession that states that this was an accidental killing." The court ruled that the district attorney could go into a "very limited area of the reasons that he was arrested." It did not permit questions about the earlier crimes, but it allowed questions about "the circumstances of why he was a suspect and brought in on these charges [so] as to refute his claim that he would have volunteered this confession in absence of any other actions pending against him." The district attorney then elicited the testimony that defendant did not confess until after he had committed two additional assaults, one on a 14-year-old girl and one on a 15-year-old girl (i.e., the assaults of August 13 and 14, 1989). Defendant still insisted that he did not confess merely because he knew he had been caught. The district attorney did not elicit details of the assaults or mention any of the earlier crimes.

This limited cross-examination was permissible in light of defendant's testimony on direct examination. Evidence that defendant did not confess until he had been arrested for two more assaults and was a suspect in this case was probative on why and under what circumstances he confessed, and thus to the credibility of that confession.

Defendant next complains that the district attorney questioned him about the attention he had been giving to a "young, small, Asian woman" reporter who had occasionally been in the courtroom. Defendant admitted that he liked "Asian women" but denied that he had paid special attention to this person. Defendant contends this questioning was irrelevant and should not have been permitted. However, he failed to object to the questions, thus making the issue not cognizable on appeal. (*People v. Cooper, supra,* 53 Cal.3d at p. 822.) *After* this questioning, defendant objected to another line of questions, which the court sustained. In arguing the point outside the presence of the jury, defense counsel argued that the questions to which he objected had no bearing on the case, "anymore so than asking him about the Japanese reporter [obviously referring to the same person]." But counsel never objected to the earlier questions or asked that anything be stricken. In any event, the questioning was surely harmless. Defendant denied paying particular attention to this reporter and, as the trial court noted, "the incident regarding the Japanese reporter, I presume is something the jury could have observed."

Defendant also complains of questioning about his sexual relationship with his wife. Defendant testified on cross-examination that he raped "for

the sexual satisfaction, not for the power trip." The district attorney asked, if that were the case, why did he not just go home to his wife. Defendant responded that sometimes she "was on her period" and sometimes they were fighting. He denied that he sometimes raped a woman so he could then go home and have sex with his wife. When the district attorney asked about an inconsistent statement he had made to a police officer, defendant objected and moved for a mistrial. The court denied a mistrial. Noting that on direct examination defendant had "virtually described himself as a serial rapist," it permitted questions regarding defendant's motive for rape while prohibiting questions about specific uncharged crimes. Defendant admitted that earlier he had stated, "[W]hat's weird is my wife was right here and she's willing to make love to me any time, and sometimes I didn't want to make love to her until I made love to another lady."

These limited questions regarding defendant's motive for rape were also permissible. The prosecution did not elicit details about other crimes or even suggest they were numerous. On direct examination, defendant had made clear that sometimes his "evil" side had prevailed, and he had raped on other occasions. Accordingly, we see no error and no prejudice. Defendant contends the questioning was impermissibly prejudicial at the penalty phase. We disagree. Defendant's motivation for raping Toyoshima was clearly relevant to the penalty determination as a circumstance of the crime. (§ 190.3, factor (a).)[8]

### 3. Alleged Prosecutorial Misconduct

■ Defendant contends the prosecutor committed misconduct while cross-examining him. The district attorney questioned him extensively about the relative positions he and Toyoshima had occupied when he shot her. He also asked how defendant's testimony could be reconciled with the evidence regarding the bullet's trajectory. Defendant admitted he could not explain it and said "this thing happened fast." During this questioning, the prosecutor also asked if she had been kneeling in front of him and had bitten him, and whether he had been forcing her to orally copulate him, eliciting denials in each instance. Later, defendant moved for a mistrial, contending that these latter questions were improper. In response, the prosecutor argued that the physical evidence did not support defendant's version of what had happened but did make it "entirely plausible that she was shot kneeling before somebody." Therefore, he asked defendant "about the possibility of the oral

---

[8]Defendant also summarily asserts that he "was not provided with notice that these matters would be used against him as required by state law and the federal Constitution . . . ." We need not consider such a perfunctory assertion unaccompanied by supporting argument. (*People v. Ashmus* (1991) 54 Cal.3d 932, 985, fn. 15 [2 Cal.Rptr.2d 112, 820 P.2d 214].) In any event, the prosecution does not have to provide advance notice of how it will cross-examine the defendant.

copulation." The court denied a mistrial, finding the questions not improper because "it's an issue for the jury to determine."

The court did not abuse its discretion in denying a mistrial. (*People v. Silva* (2001) 25 Cal.4th 345, 372 [106 Cal.Rptr.2d 93, 21 P.3d 769].) "Prosecutors have wide latitude to discuss and draw inferences from the evidence at trial. [Citation.] Whether the inferences the prosecutor draws are reasonable is for the jury to decide." (*People v. Dennis* (1998) 17 Cal.4th 468, 522 [71 Cal.Rptr.2d 680, 950 P.2d 1035]; see also *People v. Bolton* (1979) 23 Cal.3d 208, 212 [152 Cal.Rptr. 141, 589 P.2d 396].) Here, the prosecutor simply drew an inference from the evidence and asked defendant about it. As defendant argues, it is misconduct for the prosecutor to state facts not in evidence or to imply the existence of evidence known to the prosecutor but not to the jury. (*People v. Bolton, supra,* at pp. 212-213.) The prosecutor, however, did not do so. It was clear to the jury that the questions were based solely on the evidence it had heard. As the trial court correctly noted, it was up to the jury to determine the reasonableness of the inferences. The record contains no evidence that the prosecutor asked the questions in bad faith. Accordingly, we see no misconduct. Additionally, we see no prejudice under any standard. Defendant argues that the jury deliberated "in an unfairly emotionally charged environment created by the prosecutor's baseless oral copulation questions." On the contrary, as noted, the jury reviewed the evidence dispassionately, as shown by its acquittal of the sodomy charge.

### 4. *Instructional Issue*

The trial court gave the standard jury instruction on weighing circumstantial evidence, including in part that if "one interpretation of such evidence appears to you to be reasonable, and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable." (See CALJIC No. 2.01.) Defendant argues that the instruction impermissibly lowered the reasonable doubt standard of proof and created an impermissible mandatory presumption of guilt. We have repeatedly rejected these arguments and continue to do so. (*People v. Seaton* (2001) 26 Cal.4th 598, 667-668 [110 Cal.Rptr.2d 441, 28 P.3d 175]; *People v. Ray* (1996) 13 Cal.4th 313, 347-348 [52 Cal.Rptr.2d 296, 914 P.2d 846].)

### D. Penalty Phase Issues

### 1. *Late Notice of Aggravating Evidence and Denial of a Continuance*

Defendant contends the court prejudicially erred in permitting the prosecution to file a late notice of aggravating evidence and denying him a

continuance to prepare for the newly noticed evidence. The record does not support the contention.

The original notice of aggravating evidence, which the prosecutor filed long before trial, provided notice of all but one of the aggravating incidents later presented at trial. On March 9, 1992 (all further specific dates in this subpart are to the year 1992), at the end of the prosecution guilt-phase case-in-chief, the district attorney filed an amended notice of aggravating evidence, adding six new incidents of alleged criminal conduct, all involving incidents in jail in 1990 and 1991. Ultimately, only one of these new incidents was actually presented at trial, the one in which defendant threw a chair at Barbara F., his attorney at the time. On March 18, after the guilt verdict, the court held a hearing on the admissibility of this evidence. The district attorney stated that he did not learn of these other incidents until the week of February 24, when he subpoenaed jail records. He also stated, and defense counsel did not disagree, that he then promptly notified defense counsel of the incidents and provided photocopies of the reports. Defense counsel asked the court to refuse to admit the evidence or at least grant a three-week continuance to investigate the new incidents. Concerned about maintaining the "integrity of this jury" after such a long continuance, the court wondered if so much time was needed given the ready availability of potential witnesses. It agreed with the district attorney's observation that Barbara F.—a member of the public defender's office—was "right next door." It also noted that the court and parties would have five days off before the penalty phase began. Accordingly, it denied a continuance without prejudice to a further showing of need.

Defendant then moved for a hearing on whether substantial evidence supported admission of the alleged new crimes. (See *People v. Phillips* (1985) 41 Cal.3d 29, 72, fn. 25 [222 Cal.Rptr. 127, 711 P.2d 423].) The court agreed to conduct the hearing, and scheduled it to begin the next Monday, five days later. When defense counsel stated he would not be ready to proceed by then, the court noted that he had five days in which to prepare, and that all the potential witnesses "are virtually within, probably a five hundred yard radius of where we sit." Defense counsel responded that there might be other witnesses. The court said that if it turned out that defendant needed additional time it would consider the matter again. Accordingly, it denied a further continuance, again without prejudice.

The next hearing in open court was not actually held until Thursday, March 26, eight days later. (The hearing on defendant's first *Marsden* motion intervened, ending on March 19.) Defense counsel again asked for a continuance, explaining that his investigator had been able to interview only

one potential witness. The court stated that it might yet refuse to admit evidence due to defendant's inability to investigate, but it wanted to rule on specific items of evidence. It noted that the prosecution would not actually present the evidence to the jury for a week or two, and that "these witnesses are county employees virtually under our thumb." It ordered the prosecution to present its evidence outside the presence of the jury. A hearing then ensued, with the district attorney presenting witnesses and defense counsel cross-examining them. Among the witnesses was Officer John Tanner, who testified about the Barbara F. incident and was cross-examined by defense counsel. The court also ordered Tanner and other witnesses to be available to the defense the next day. Later, it noted that, if it wished, the defense could subpoena Barbara F., who was readily available. Ultimately, the court excluded four of the six newly noticed incidents due to insufficient evidence and permitted evidence of the other two incidents. However, the prosecution actually presented evidence only of the incident involving Barbara F.

Officer Tanner testified about the Barbara F. incident in front of the jury on Wednesday, April 1. After that day, the court recessed until Monday, April 6. On that day, defendant called Barbara F. as a witness to also testify about the incident.

Section 190.3 provides that, with exceptions not relevant here, "no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as determined by the court, prior to trial." The purpose of this provision "is to advise an accused of the evidence against him so that he may have a reasonable opportunity to prepare a defense at the penalty trial." (*People v. Miranda* (1987) 44 Cal.3d 57, 96 [241 Cal.Rptr. 594, 744 P.2d 1127].) "[W]here the prosecution learns of evidence it intends to use in aggravation at the penalty phase for the first time after trial has commenced, exclusion of this evidence under section 190.3 is not necessarily compelled. [Citation.] Under such circumstances, the defendant is entitled to prompt notice of the newly discovered evidence, and, if necessary, to a reasonable continuance to enable him or her to prepare to meet that evidence. If the prosecutor's delay in affording notice is unreasonable or unexcused, or if the delay would prejudice the defense, the court must exclude the evidence." (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1070 [5 Cal.Rptr.2d 230, 824 P.2d 1277].)

Under these standards, we see no error. Only one of the newly noticed incidents was actually presented to the jury. The district attorney did not learn of that incident until late February. When he did learn of it, he promptly gave oral notice to defense counsel and provided photocopies of

the reports. Defendant complains that the district attorney did not file the formal written notice until March 9, but section 190.3 requires *notice*, not written notice. Although written notice is obviously preferable, the prompt oral notice was sufficient, especially when augmented by the later written notice. (*People v. Miranda, supra,* 44 Cal.3d at p. 97.)

Moreover, defendant had ample opportunity to meet the evidence. All possible witnesses were readily available to the parties. Officer Tanner did not actually testify in front of the jury until April 1, over a month after defendant learned of the incident and over three weeks after the formal written notice. Defendant had a preliminary opportunity to cross-examine the officer at the hearing outside the jury's presence, and the court ordered the officer to make himself further available to the defense. Thus, defendant had full opportunity to prepare to cross-examine the only prosecution witness. Then came five days without judicial proceedings before the defense presented its case, in which time it had further opportunity to investigate. When the defense did present its case, it not only had had an opportunity to interview Barbara F., it actually presented her as a witness.

Defendant argues the prosecution could have discovered the evidence sooner by subpoenaing the jail records sooner. This is no doubt correct, but in the absence of prejudice to defendant, the notice, given promptly after the prosecution actually learned of the incident, was adequate. Defendant also argues that another officer had viewed the incident, and he might have presented him as a witness had he received the three-week continuance he originally requested. However, defendant effectively received continuances during the periods of time when court was not in session. Moreover, the court denied the requested continuances each time without prejudice. It made clear that it would seriously consider giving defendant even more time on a specific showing of need. Defendant never showed, or even specifically claimed, that yet more time was necessary to investigate this incident, or to interview the second officer or any other witness. (*People v. Mitcham, supra,* 1 Cal.4th at p. 1070.)

Finally, defendant argues that the late notice deprived him "of the ability to take key evidence into account during jury selection in the guilt phase of the trial," and to "question the jurors regarding these subjects during the voir dire process." The purpose behind the notice requirement, however, is to permit the defendant to prepare a defense at the penalty trial, not to question prospective jurors about every bit of evidence they might hear. Defendant's argument would mean that no evidence discovered after the beginning of trial would ever be admissible, which is not the law. Moreover, the original notice of aggravating evidence, filed long before trial, did provide notice of

one act of violence in jail, so defendant knew that jail violence was a potential issue at trial. We see no error in the trial court's permitting the prosecution to prove the Barbara F. incident despite the late notice.

### 2. *Issues Involving Evidence from One of the Rape Victims*

Before the beginning of the penalty phase, defense counsel, citing *Payne*, sought and obtained from the court a protective order prohibiting the prosecution from asking victim witnesses what the appropriate punishment should be. (See *Payne v. Tennessee* (1991) 501 U.S. 808, 830, fn. 2 [111 S.Ct. 2597, 2611, 115 L.Ed.2d 720].) Later the district attorney informed the court that one of the rape victims, Mary G., the victim of the December 8, 1988, incident, was opposed to the death penalty. He requested a ruling that, like the prosecution, the defense could not ask Mary G. what punishment she thought defendant should receive. Defense counsel urged that she be allowed to testify "what impact this has on her." The court ruled that impact evidence was admissible, but her opinion on penalty was not.

Later still, the district attorney informed the court that Mary G. refused to testify, and a hearing was held as to her availability as a witness. Mary G. was present and represented by an attorney, who explained her rights and obligations to her. Through counsel, she stated she would not testify unless she could express her views on the punishment defendant should receive. Defense counsel argued she should be allowed to present a "victim impact statement," because the "information that she wants to provide to this Court is the information as to how this incident affected her. The fact that she also has feelings for or against the death penalty are part of her feelings, and they should be allowed to come before the court because that's what she's going to explain." The court reiterated that Mary G. could testify about the impact the crime had on her, but not about what punishment defendant should receive.

The court questioned Mary G. personally under oath. She said, "I cannot in good conscience testify," and that potential sanctions, including sanctions for criminal contempt under section 166, would not cause her to testify. Neither more time nor anything the court said or did would cause her to change her mind. Defense counsel was permitted to question her but chose not to do so. The court then found her unavailable as a witness. Defense counsel objected to introducing her preliminary hearing testimony, arguing that the defense purpose in cross-examining the witness at the preliminary hearing differed from that at the penalty phase. The court ruled that the "testimony is simply like any other testimony that's limited, and this testimony will be limited to the acts alleged to have occurred or been perpetrated

by the defendant; and that if the witness refuses to testify . . . regarding victim impact, which she has the ability to testify within the rules of the court, that is an issue which we will address if she were so to testify. But she's indicated she refuses to testify, so that issue is not before me."

The transcript of Mary G.'s preliminary hearing testimony was then read to the jury.

Defendant contends the court committed two distinct errors. He first argues the court erred in not permitting Mary G. to testify about what punishment she believed he should receive. He argues the limitation violated the federal constitutional rule that the " ' "sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." ' " (*Skipper v. South Carolina* (1986) 476 U.S. 1, 4 [106 S.Ct. 1669, 1670-1671, 90 L.Ed.2d 1].) He also argues the testimony was admissible under section 190.3, factor (k), which requires the trier of fact to consider "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." The court's ruling was correct. Although victim impact testimony is admissible, the victim's view as to the proper punishment is not.

It is clear that the *prosecution* may not elicit the views of a victim or victim's family as to the proper punishment. (*Booth v. Maryland* (1987) 482 U.S. 496, 508-509 [107 S.Ct. 2529, 2535-2536, 96 L.Ed.2d 440].) The high court overruled *Booth* in part, but it left intact its holding that "the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment." (*Payne v. Tennessee, supra*, 501 U.S. at p. 830, fn. 2 [111 S.Ct. at p. 2611].) That court has never suggested that the defendant must be permitted to do what the prosecution may not do. The views of a crime victim, especially, as here, of the victim of one of the noncapital crimes, regarding the proper punishment has no bearing on the defendant's character or record or any circumstance of the offense. (*Skipper v. South Carolina, supra*, 476 U.S. at p. 4 [106 S.Ct. at pp. 1670-1671].) Hence, the Eighth Amendment to the United States Constitution does not compel admission of those views. (*Robison v. Maynard* (10th Cir. 1991) 943 F.2d 1216, 1216-1217 [even after *Payne v. Tennessee, supra*, 501 U.S. 808, "testimony from a victim's relative that she did not want the jury to impose the death penalty was improper mitigating evidence and inadmissible at the penalty phase hearing"].)

Citing section 190.3 and the United States Constitution, we have held that testimony from somebody "with whom defendant assertedly had a

significant relationship, that defendant deserves to live, is proper mitigating evidence as 'indirect evidence of the defendant's character.'" (*People v. Ervin* (2000) 22 Cal.4th 48, 102 [91 Cal.Rptr.2d 623, 990 P.2d 506]; see also *People v. Mickle* (1991) 54 Cal.3d 140, 194 [284 Cal.Rptr. 511, 814 P.2d 290]; *People v. Heishman* (1988) 45 Cal.3d 147, 194 [246 Cal.Rptr. 673, 753 P.2d 629].) This evidence is admitted, not because the person's opinion is itself significant, but because it provides insights into the defendant's character. (*People v. Ochoa* (1998) 19 Cal.4th 353, 456 [79 Cal.Rptr.2d 408, 966 P.2d 442].) ▓▓▓ The only relationship Mary G. had with defendant was as his rape victim. The trial court made clear it would permit Mary G. to provide relevant mitigating evidence, but defendant made no offer to prove that her experience as his victim caused her to provide testimony—direct or indirect—about his good character. (Evid. Code, § 354.) Defendant sought to prove that Mary G. did not want defendant to receive the death penalty, and perhaps also that she held this opinion even though she was one of his victims. This latter point may have demonstrated the strength of her views, but no more. Neither defendant nor Mary G. suggested that her opinion was based on defendant's character, or, indeed, on anything involving defendant personally, rather than her general views on the death penalty. Her personal views on the death penalty, however, were no more relevant to this proceeding than the personal views of defendant's many other victims. The court properly precluded Mary G. from expressing her view on the correct punishment while permitting her to provide any mitigating evidence she may have had to give.[9]

Defendant also argues that, for two reasons, the court erred in admitting Mary G.'s preliminary hearing testimony. As we have explained (at pp. 609, 611, *ante*), a witness's previous testimony against a criminal defendant may be admitted at trial if the witness is unavailable, and the defendant had the opportunity at the previous hearing to cross-examine the witness with an interest and motive similar to that at trial. Defendant contends the court erred both in finding that Mary G. was unavailable and that his interests and motives in cross-examining her were similar on both occasions. Again, we disagree.

The circumstance that Mary G. was physically present in the courtroom and merely refused to testify does not preclude a finding of unavailability.

---

[9]Defendant notes that in *People v. Kraft* (2000) 23 Cal.4th 978, 1072 [99 Cal.Rptr.2d 1, 5 P.3d 68], the trial court permitted, without apparent objection, a witness to testify that he did not believe the defendant should receive the death penalty. It appears that testimony was based, at least in part, on the defendant's personal character. (*Ibid.*) More importantly, the fact that evidence is admitted in one trial, perhaps out of caution, does not mean it must be admitted in another trial. "[A] ruling by a different court in a different trial has no bearing on the correctness of the rulings in this trial." (*People v. Carpenter* (1997) 15 Cal.4th 312, 408 [63 Cal.Rptr.2d 1, 935 P.2d 708].)

Evidence Code section 240, which defines when a witness is unavailable, does not specifically describe this situation, but that statute does not "state the exclusive or exact circumstances under which a witness may be deemed legally unavailable for purposes of Evidence Code section 1291." (*People v. Reed* (1996) 13 Cal.4th 217, 228 [52 Cal.Rptr.2d 106, 914 P.2d 184].) Courts have admitted "former testimony of a witness who is physically available but who refuses to testify (without making a claim of privilege) if the court makes a finding of unavailability only after taking reasonable steps to induce the witness to testify unless it is obvious that such steps would be unavailing." (*People v. Sul* (1981) 122 Cal.App.3d 355, 364-365 [175 Cal.Rptr. 893] (plur. opn.), citing *Mason v. United States* (10th Cir. 1969) 408 F.2d 903; accord, *People v. Francis* (1988) 200 Cal.App.3d 579, 584 [245 Cal.Rptr. 923]; *People v. Walker* (1983) 145 Cal.App.3d 886, 894 [193 Cal.Rptr. 812].)

The court's efforts to induce Mary G. to testify were reasonable under the unusual circumstances of this case. The court questioned her under oath and asked whether additional time or prosecution for criminal contempt would change her mind. It had no power to incarcerate this victim of a sexual assault for refusing to testify concerning that assault. (Code Civ. Proc., § 1219, subd. (b).) But defendant argues the court should at least have fined her for contempt of court. We disagree. Trial courts "do not have to take extreme actions before making a finding of unavailability." (*People v. Sul, supra*, 122 Cal.App.3d at p. 369 (conc. opn. of Zenovich, Acting P. J.).) Defendant did not ask the court to take stronger action against her, which was understandable. Because Mary G. was clearly trying to help defendant in refusing to testify against him, he could reasonably not have actually wanted to force her to testify by threat of contempt charges. Under the circumstances, the court did not actually have to fine Mary G.

While we find no error in these unusual circumstances, we add that witnesses have no right to make demands of the court like those Mary G. made, and no right to act as a 13th juror. Witnesses under subpoena and present in court have a duty to testify in accordance with the rules of evidence, a duty trial courts have the power to enforce. Witnesses may not condition their testimony on being allowed to state their personal, irrelevant, opinions.

Defendant finally argues that his motive and interest in cross-examining Mary G. at the preliminary hearing were different from those at the penalty phase because the sole question at the preliminary hearing was his guilt of the assault on Mary G., but at the penalty phase the question was the proper punishment for his crimes. Hence, he argues, at the preliminary hearing he

had no interest in eliciting mitigating evidence, his sole interest at the penalty phase. However, the prosecution offered the testimony at the penalty phase only to prove defendant's guilt of criminal activity involving force or violence under section 190.3, factor (b). Defendant had full opportunity, interest, and motive to cross-examine the witness on this point at the preliminary hearing. He made no apparent attempt to call Mary G. as his own witness at the penalty phase. The record presents no reason to suppose she would have refused to testify on defendant's *behalf* if defendant had wanted to call her. Defendant's motive and interest in cross-examining Mary G. regarding his guilt of the crimes against her warranted the court's admission of her preliminary hearing testimony.

Any error in admitting the preliminary hearing testimony was also harmless. We doubt that defendant would have benefited from the jury's seeing and hearing Mary G.'s live testimony rather than merely hearing the transcript of her earlier testimony. Moreover, the prosecution presented evidence of 14 separate criminal incidents on 13 different dates, not counting the crimes proven at the guilt phase and the jail incidents. The crimes against Mary G., although serious, did not particularly stand out in this long criminal history. She was, for example, an adult and not one of defendant's numerous juvenile victims. The crimes against Mary G. were less serious than the near-fatal stabbing of Cynthia B. The penalty decision in this case did not turn on whether defendant had engaged in 13 rather than 14 other violent criminal episodes.

### 3. *Admission of Other Prosecution Evidence*

One of the other crimes the prosecution proved was that defendant stabbed Cynthia B. in the abdomen on April 14, 1989, and that her injury required surgery. As part of the proof, the prosecution offered a single photograph of her scarred abdomen, which showed both the original stab wound and the surgical incision. Over objection, the court admitted the photograph, finding it "not unduly gruesome," and that its probative value outweighed its prejudicial effect. The victim testified as to which portion of the scar was due to the stab wound and which portion to the surgery. Defendant contends the court erred in admitting the photograph. We disagree. The evidence was relevant to show precisely what defendant did to this victim, which was relevant to the penalty determination. (*People v. Wader* (1993) 5 Cal.4th 610, 655 [20 Cal.Rptr.2d 788, 854 P.2d 80].) Although witnesses orally described the wound, a photograph is also admissible to illustrate that testimony. (*People v. Scheid* (1997) 16 Cal.4th 1, 15 [65 Cal.Rptr.2d 348, 939 P.2d 748].) The victim's "testimony enabled the jury to evaluate to what extent the photograph in question reflected the

trauma of the assault rather than the effects of the surgery." (*People v. Wader, supra,* at p. 656.) Moreover, the surgery and its effects were part of the injury defendant inflicted, albeit indirectly. We see no abuse of discretion in admitting the photograph. (*Id.* at p. 655.)

 Over objection, the court permitted four of defendant's victims to testify about racial remarks defendant made to them while he committed the crimes. Defendant contends the court erred because the remarks were irrelevant to the penalty determination, were unduly prejudicial, and were constitutionally protected speech. We disagree. Although the remarks themselves were not criminal, "they occurred in the course of" violent criminal behavior, "and they were thus admissible under [section 190.3,] factor (b) to demonstrate the aggravated nature of defendant's unlawful conduct." (*People v. Montiel* (1993) 5 Cal.4th 877, 916-917 [21 Cal.Rptr.2d 705, 855 P.2d 1277].) Specifically, racial epithets from a defendant's own mouth are admissible to show the facts surrounding the crimes. (*People v. Quartermain* (1997) 16 Cal.4th 600, 627-631 [66 Cal.Rptr.2d 609, 941 P.2d 788]; *People v. Scott* (1997) 15 Cal.4th 1188, 1219 [65 Cal.Rptr.2d 240, 939 P.2d 354]; *People v. McPeters* (1992) 2 Cal.4th 1148, 1189 [9 Cal.Rptr.2d 834, 832 P.2d 146].) Contrary to defendant's contention, based on *Dawson v. Delaware* (1992) 503 U.S. 159 [112 S.Ct. 1093, 117 L.Ed.2d 309], admission of the evidence, relevant to actual criminal conduct, does not violate his constitutional free speech rights. (*People v. Quartermain, supra,* at pp. 629, 631.) Finally, because the remarks were properly admitted, the prosecutor properly mentioned them in his opening statement and closing argument. (*People v. Scott, supra,* at p. 1219.)

### 4. *Exclusion of Defense Evidence*

#### a. *Expert testimony regarding remorse*

 Over prosecution objection, defendant sought to present opinion testimony of Dr. Douglas Harper, a psychiatrist, regarding defendant's statements of remorse in his tape-recorded confession of August 16, 1989. The court held a hearing outside the jury's presence regarding the admissibility of this evidence. Dr. Harper testified that he was not asked to diagnose defendant or determine whether any mental defense might exist, but only to investigate the question of remorse. To do so, he interviewed defendant twice, read a transcript of the confession, and listened to the recorded confession. Defendant offered Dr. Harper solely to give an opinion regarding whether he expressed remorse in that confession. His opinion was that defendant "was experiencing remorse, and had the capacity to do so at that time." He based his opinion on the "typed transcript of his statement, my interview, my experience in listening to the tapes."

The court excluded the evidence. It noted that remorse is relevant to the issues at trial. But, under the facts, it found the question was not the proper subject of expert testimony. It concluded that it was for the jury, not an expert, to determine "the sincerity or lack thereof" of any expressions of remorse. Defense counsel asked the court at least to admit the tape recording of the confession itself, so the jury could hear it and draw its own conclusion. Over prosecution objection, the court exercised its discretion to admit the recording. In response to the prosecutor's argument that admitting the tape would deprive him of the right to cross-examine defendant (see *People v. Edwards* (1991) 54 Cal.3d 787, 838 [1 Cal.Rptr.2d 696, 819 P.2d 436]), the court noted that defendant had testified at the guilt phase—at which he expressed remorse—and "the jury has had an opportunity to observe the defendant in that capacity."

Defendant contends the court erred in excluding Dr. Harper's testimony. We disagree. Certainly, the presence of remorse is relevant at the penalty phase, as the court realized. (*People v. Marshall* (1996) 13 Cal.4th 799, 855 [55 Cal.Rptr.2d 347, 919 P.2d 1280].) But the court acted within its discretion in permitting the jury to listen to the tape and judge for itself defendant's expressions of remorse, while excluding expert opinion that the remorse was sincere. Expert opinion testimony must be "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact . . . ." (Evid. Code, § 801, subd. (a).) We review the trial court's ruling in this regard for abuse of discretion. (*People v. Sanders* (1995) 11 Cal.4th 475, 508 [46 Cal.Rptr.2d 751, 905 P.2d 420].)

Defendant cites cases in which expert testimony on remorse was in fact admitted. (E.g., *People v. Hart, supra,* 20 Cal.4th at pp. 629-630; *People v. Davis* (1995) 10 Cal.4th 463, 499, 529 [41 Cal.Rptr.2d 826, 896 P.2d 119].) As we have noted, the fact that evidence is admitted in one trial does not mean it must be admitted in another. (See fn. 9, *ante.*) The circumstances in which evidence is offered and its exact nature, and the exercise of the trial court's discretion, can vary from case to case. Nevertheless, we do not doubt that sometimes the question of remorse is properly the subject of expert testimony. In *People v. Edwards, supra,* 54 Cal.3d at pages 818-821, 837-838, we said the trial court could prohibit the defendant from presenting his own taped statement because the statement was hearsay and not sufficiently trustworthy to come within an exception to the hearsay rule. One reason not to permit such hearsay was that doing so would deprive the prosecution of the opportunity to cross-examine the defendant. (*Id.* at pp. 820, 838.) We noted that "the defense could . . . have presented expert testimony which could have used these materials as a basis for an expert

opinion," although none was offered in that case. (*Id*. at p. 838.) Here, the court excluded the expert testimony but admitted the taped statement itself. Doing so was within its discretion.

Defendant did not seek to have Dr. Harper testify about expressions of remorse to Dr. Harper himself or as part of a larger diagnosis of defendant's mental state. Rather, he offered Dr. Harper solely to express an opinion regarding the weight the jury should give the expressions of remorse made during the taped statement. Essentially, defendant offered Dr. Harper as an expert on defendant's credibility in making that statement. However, the jury was as able as an expert to judge that question for itself. Credibility questions are generally not the subject of expert testimony, or at least a court could so conclude in a given case. (*People v. Anderson* (2001) 25 Cal.4th 543, 576 [106 Cal.Rptr.2d 575, 22 P.3d 347] [" 'the psychiatrist may not be in any better position to evaluate credibility than the juror' "]; *People v. Sergill* (1982) 138 Cal.App.3d 34, 39 [187 Cal.Rptr. 497] [trial court abused its discretion in *admitting* expert opinion that a prosecution witness was credible].) Here, the court permitted the jury to hear the taped statement for itself. Moreover, unlike the expert, the jury had observed defendant testify and express remorse at the guilt phase, where he was cross-examined, and it heard evidence regarding the circumstances of the taped statement. Thus, it could fully judge the credibility of defendant's expressions of remorse without hearing from Dr. Harper.

### b. *Defendant's statements to his wife*

On August 16, 1989, the day defendant first confessed to these crimes, he also spoke to his wife twice, once on the telephone and once in person at the jail. Both conversations were tape-recorded. At the guilt phase, defendant testified briefly about these conversations. He said he did not "want her to panic," so he "tried to soothe her, tell her I was in trouble and prepare for something serious." Defendant knew the police were listening, but he was not told the conversations would be recorded. At the penalty phase, his wife also testified about these conversations. She said defendant told her "he had done something really bad," and he "was sorry because he messed up my life." He said "it was an accident," that he was "very sorry," that he "prayed to God" and was "clean with God now," and he expressed concern for her and the people he had hurt.

After his wife testified, defendant sought to admit the tape recordings of the conversations under the "state of mind" exception to the hearsay rule (see Evid. Code, § 1250), arguing that they showed remorse. The prosecutor objected that the statements were hearsay and insufficiently reliable to be

admissible. The court excluded the statements. Citing Evidence Code section 1252, it "determined after listening to the tapes and the circumstances that the primary purpose of the tapes was to placate the defendant's wife and the statements are ruled inadmissible on the basis of their lack of trustworthiness . . . ." It found these conversations different in this regard than the taped confession to the police, which it had "found to be trustworthy for admission in these proceedings . . . ." When defendant asserted the Eighth Amendment to the United States Constitution as a basis for admitting the evidence, the court stated that "in view of the fact that the testimony was available by virtue of the witnesses that were called and the other testimony which has been received . . . the Court did balance and weigh that consideration and take that into consideration in its ruling as well."

Defendant contends the court erred in excluding the tape recordings of the conversations with his wife because they showed remorse. The Attorney General argues that defendant did not express remorse for the crimes but only said he was sorry for his wife's sake. Although defendant did primarily express concern for his wife, portions of the conversations might be interpreted as showing remorse. But, even if relevant, the recordings were properly excluded. Evidence offered under the state of mind exception to the hearsay rule is inadmissible "if the statement was made under circumstances such as to indicate its lack of trustworthiness." (Evid. Code, § 1252; see *People v. Edwards, supra*, 54 Cal.3d at pp. 819-820.) The United States Constitution compels the admission of hearsay evidence only if the proponent shows the evidence is highly relevant to a critical issue and is sufficiently reliable. (*People v. Stanley* (1995) 10 Cal.4th 764, 839 [42 Cal.Rptr.2d 543, 897 P.2d 481]; *People v. Edwards, supra*, at pp. 837-838.) Here, the court reasonably found the statements to his wife were untrustworthy because his primary motivation in making them was to placate her. "There was 'ample ground to suspect defendant's motives and sincerity' when he made the statements." (*People v. Edwards, supra*, at p. 820, quoting *People v. Whitt* (1990) 51 Cal.3d 620, 643 [274 Cal.Rptr. 252, 798 P.2d 849].) "The same lack of reliability that makes the statements excludable under state law makes them excludable under the federal Constitution." (*People v. Livaditis* (1992) 2 Cal.4th 759, 780 [9 Cal.Rptr.2d 72, 831 P.2d 297].) Moreover, defendant had ample opportunity to present evidence of remorse without the recordings. The court acted within its discretion in admitting the taped confession and allowing the witnesses to testify about the conversations between defendant and his wife while excluding the recordings of those conversations themselves. (*People v. Edwards, supra*, at p. 820.)

Defendant also contends the conversations were admissible as prior consistent statements under Evidence Code sections 791, 1236. The issue is not

cognizable on appeal because defendant did not present that theory of admissibility at trial. (Evid. Code, § 354; *People v. Alcala* (1992) 4 Cal.4th 742, 795-796 [15 Cal.Rptr.2d 432, 842 P.2d 1192]; *People v. Livaditis, supra,* 2 Cal.4th at pp. 778-780.) Moreover, even were the issue preserved, defendant has not clearly shown a basis on which to admit the evidence on this theory. A prior statement consistent with a witness's trial testimony is admissible only if either (1) a prior *in*consistent statement was admitted and the consistent statement predated the inconsistent statement, or (2) an express or implied charge is made that the testimony is recently fabricated or influenced by bias or other improper motive, and the consistent statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen. (Evid. Code, § 791.) Here, defendant's motive to fabricate and make himself look as good as possible existed at the time of these conversations, which occurred after his arrest. Defendant argues that evidence of statements he made in jail in an argument with a nurse—"You better treat motherfuckers like me with respect, I'm in for murder and killing again is nothing"; and "I'm going to kill her. One more doesn't make a difference"—was inconsistent both with his trial testimony and the earlier conversations with his wife. The trial court never had an opportunity to rule on this point because defendant did not raise it (see *People v. Livaditis, supra,* at p. 780), but it is not clear that these words, spoken in the heat of the moment in jail in expressing anger, were inconsistent with defendant's expressions of remorse for the crimes or his conversation with his wife. As far as we can determine, the district attorney never argued the jail statements were inconsistent with the statements of remorse. We see no error and certainly no prejudice.

c. *Testimony of defendant's first attorney*

■ Barbara F., defendant's first attorney, testified for the defense without objection about the jail incident in which defendant threw a chair at her. Additionally, defendant sought to have her testify on two other points: (1) that she believed the death penalty was not appropriate in this case; and (2) that, with defendant's authorization, she sought to settle the case by a guilty plea in return for a sentence of life in prison without the possibility of parole. He also sought to admit a letter, dated July 5, 1990, Barbara F. wrote to the district attorney arguing against the death penalty. The district attorney did not object to evidence that defendant sought to settle the case by a guilty plea, and the court admitted it as showing remorse on defendant's part.[10] However, he objected to the letter as hearsay. After reading the letter,

---

[10]Evidence that defendant sought to plead guilty in return for a life sentence arguably shows primarily a desire to avoid the death penalty rather than remorse. Because the court admitted the evidence, however, we need not decide whether it was required to do so.

the court sustained the objection. In response to defendant's argument that the letter contained information the jury should consider in making the penalty determination, the court stated that "the issues that you're addressing . . . are issues which are proper in terms of summation or other evidence that can properly be introduced."

The district attorney also objected to Barbara F.'s expressing her opinion whether defendant should receive the death penalty. After reviewing our then recent decision of *People v. Mickle, supra,* 54 Cal.3d 140, and the earlier decision of *People v. Heishman, supra,* 45 Cal.3d 147, the court admitted the evidence. It also indicated it would permit the prosecutor to impeach the witness with cross-examination about other acts of violence, "assuming that that issue is opened by examination of this witness." It did not, however, permit the witness to state the reasons for her opinion.

Barbara F. testified about the jail incident and explained that defendant felt betrayed and became angry when she told him that she had to withdraw from the case. She also testified that, with defendant's agreement, she attempted to settle the case for a disposition of life in prison without the possibility of parole, and that she wrote a letter to the district attorney arguing that that was the appropriate disposition. In her opinion, which she felt "very strongly," defendant should receive a sentence of life in prison without the possibility of parole. The court did not permit her to state the reasons for this opinion. On cross-examination, the prosecutor asked her about her knowledge of other rapes defendant had committed and other jail incidents.

Defendant contends the court erred in refusing to permit Barbara F. to testify about why she believed defendant should receive a life sentence.[11] We disagree and, indeed, doubt that her opinion regarding the proper disposition should have been admitted at all. As we have discussed (at pp. 622-623, *ante*), testimony that defendant deserves to live, provided by someone who had a significant relationship with him, is admissible, not because that opinion is itself important but because the testimony provides indirect evidence of the defendant's character. (E.g., *People v. Ervin, supra,* 22 Cal.4th at p. 102.) It is questionable whether an attorney-client relationship is the sort of relationship that can result in such indirect evidence of the

---

[11]Defendant does not appear to argue the court erred in refusing to admit the letter Barbara F. wrote to the district attorney arguing against the death penalty. The ruling was clearly correct. The letter contained only inadmissible hearsay and an advocate's argument. As the trial court stated, defendant could present the mitigating evidence at trial and make the arguments to the jury, which the defense did. But a letter by his then attorney arguing on his behalf is not, itself, mitigating evidence. The way to try a penalty phase, as any trial, is to present relevant evidence in accordance with the Evidence Code, and then make appropriate arguments, not to admit as evidence a letter arguing the case.

defendant's character, but we need not decide the question, for the court admitted the opinion. But defendant made no offer to prove that Barbara F.'s reasoning provided any insight into defendant's character. Indeed, defense counsel expressly told the court that the proffered testimony "is not character testimony," but only Barbara F.'s opinion regarding the "appropriateness of the death penalty . . . given the crime . . . ." The penalty decision, however, was for the jury to make and is not the proper subject of expert testimony. (*People v. Mickle, supra,* 54 Cal.3d at p. 196.) Defendant was entitled to present mitigating evidence and to argue to the jury that a life sentence was appropriate, as he did. However, the opinion of a witness, .expert or otherwise, that a life sentence is appropriate is not relevant except to the extent it might provide insight into the defendant's character. The court did not prevent Barbara F. from providing whatever testimony she had to give about her personal experiences with and knowledge of defendant's character, but her opinion whether the crime warranted the death penalty, and, important here, her supporting reasoning, were irrelevant.

Defendant also contends the rulings were erroneous given the prosecutor's cross-examination into her knowledge of other acts of misbehavior. Defendant does not appear to argue directly that permitting this cross-examination was error. He could not do so, for he did not object to it at trial. (*People v. Riel, supra,* 22 Cal.4th at p. 1185.) The cross-examination appears to have been appropriate impeachment. (*People v. Ramos* (1997) 15 Cal.4th 1133, 1173 [64 Cal.Rptr.2d 892, 938 P.2d 950].) Moreover, it might have been permissible to rebut the implication in Barbara F.'s testimony that the chair incident was an isolated act of anger caused by her withdrawal from the case. Defendant argues that, in light of this impeachment, Barbara F. should have been permitted to explain her reasons for believing a life verdict was nonetheless proper. But he did not renew his request that Barbara F. be permitted to state her reasoning after this cross-examination. Because he did not urge admission of her reasons as rehabilitation of her opinion, he may not now argue on that basis that its exclusion was error. (Evid. Code, § 354.)

Moreover, defendant suffered no prejudice from the court's not allowing Barbara F. to state the reasons for her opinion. Those reasons were essentially arguments. They were not based on any information or perception that only Barbara F. could give. Indeed, defense counsel made clear that her testimony was *not* character evidence. But defense counsel could make those arguments to the jury as well as she could. No reason appears for the jury to have given Barbara F.'s reasons more weight than the same reasons argued by defense counsel. To the extent the jury might have been impressed by Barbara F.'s belief that he should not receive the death penalty despite being one of his victims, it heard that belief.

### 5. *Alleged Prosecutorial Misconduct*

██ Defendant contends the prosecutor committed various acts of misconduct at the penalty phase. With one exception, he did not object to the alleged misconduct. We have reviewed each of the claims as to which defendant did not object and are satisfied an objection would have cured any harm. Accordingly, those contentions are not cognizable on appeal. (*People v. Riel, supra,* 22 Cal.4th at pp. 1196-1197.)

██ The one occasion on which defendant did object discloses no misconduct. The prosecutor argued to the jury that one of the rape victims was lucky because defendant had used a condom, and "she does not have to spend the rest of her life worrying about who [defendant] has slept with" and "does not have to concern herself of [*sic*] the nightmare that may become her life if she should contract AIDS." Defendant objected, and the court admonished the jury that statements of counsel are not evidence. The prosecutor continued by arguing that the other rape victims inevitably would think about AIDS. "And," he said, "is that not yet part of the circumstance of the crimes of violence perpetrated? [¶] . . . [T]he rapist who perpetrates such conduct and clearly is indiscriminate in his contacts, also then brings to his victims yet another . . . ultimate fear that they may come down with something more as a result of this awful crime against them. And for someone to do that, knows full well what they're doing." Defendant contends the prosecutor improperly implied he was infected with the AIDS virus when no evidence supported the implication. On the contrary, the prosecutor never suggested defendant had AIDS, only that his rape victims would worry that he might. A rape victim would not know one way or the other, at least until the rapist was caught. The prosecutor properly discussed the uncertainty and mental anguish victims of an unknown rapist would inevitably feel, and the heinousness of inflicting this anguish. "The foreseeable effects of defendant's prior violent sexual assaults upon the victims—ongoing pain, depression, and fear—were thus admissible as circumstances of the prior crimes bearing on defendant's culpability." (*People v. Mickle, supra,* 54 Cal.3d at p. 187.)

Defendant's remaining contentions would be meritless even if they were cognizable. The prosecutor impeached two defense witnesses with prior felony convictions. Defendant argues that in doing so, he violated the rule that such impeachment does not extend to the facts underlying the convictions. (See *People v. Heckathorne* (1988) 202 Cal.App.3d 458, 462 [248 Cal.Rptr. 399].) We need not decide whether this rule still applies (cf. *People v. Wheeler* (1992) 4 Cal.4th 284 [14 Cal.Rptr.2d 418, 841 P.2d 938]), for the district attorney questioned the witnesses only about the convictions themselves, not the underlying facts. The first witness admitted to some convictions but claimed not to remember all of them. When the prosecutor asked

about one conviction, the witness said he remembered "plea bargaining" and explained that a plea bargain "means that I wasn't convicted in my eyes." In light of this, the prosecutor properly asked more questions about the plea bargain and what it meant. If a witness seeks to mislead the jury or minimize the facts, further questioning is proper. (*People v. Shea* (1995) 39 Cal.App.4th 1257, 1267 [46 Cal.Rptr.2d 388].) As to the second witness, the prosecutor elicited only the exact nature of the convictions, that is, facts that "would appear on the face of the record of judgment," which was proper. (*People v. McClellan* (1969) 71 Cal.2d 793, 809 [80 Cal.Rptr. 31, 457 P.2d 871].)

During his argument to the jury, the prosecutor referred to various emotions he felt about the case, including anger, sorrow, bewilderment, horror, and outrage. Defendant argues that these references to his own emotions were improper. Unlike the guilt determination, where appeals to the jury's passions are inappropriate, in making the penalty decision, the jury must make a moral assessment of all the relevant facts as they reflect on its decision. (*People v. Padilla* (1995) 11 Cal.4th 891, 956-957 [47 Cal.Rptr.2d 426, 906 P.2d 388]; *People v. Haskett* (1982) 30 Cal.3d 841, 863 [180 Cal.Rptr. 640, 640 P.2d 776].) Emotion must not reign over reason and, on objection, courts should guard against prejudicially emotional argument. (*People v. Haskett, supra,* at p. 864.) But emotion need not, indeed, cannot, be entirely excluded from the jury's moral assessment. We have reviewed the argument in context. The comments were based entirely on the evidence. We see nothing so inflammatory as to be improper or prejudicial.

The prosecutor noted to the jury that the court had admonished it not to listen or watch media coverage of the case but, he said, "aside from that coverage there has been the coverage relating to Robert Harris. [¶] . . . Let's be clear about this, none of this coverage has anything to do with your responsibility in this case. . . . To decide this case for any reason other than based upon the evidence now or guided by the instructions of this Court would require you to ignore your responsibilities as jurors. [¶] Now, it is unfortunate that the media has chosen to treat this subject in a sensational and not wholly objective manner, but none of that should make a difference in this case. There is now, no—outside this courtroom, no irate mob asking in an angry manner for the death of an innocent man. [¶] The State only asks that you, in this case, be just, be fair. Decide this case based upon the evidence that was presented here, not on the radio, not on the television. The evidence that was channeled to you properly abiding by the rules of evidence, and to view this evidence in light of the law." We see nothing improper in this attempt to prevent media coverage of another case from influencing the jury. Contrary to defendant's argument, the prosecutor did

not "urge[] the jury to impose the death penalty based on outrage at the actions of a notorious convicted inmate, rather than reason." The prosecutor did the opposite.

Defendant contends the prosecutor impermissibly impugned the integrity of defense counsel. We have reviewed the comments he cites and see nothing improper. The prosecutor did not attack defense counsel's integrity but instead attacked the defense case and argument. Doing so is proper and is, indeed, the essence of advocacy. "[T]he prosecutor has wide latitude in describing the deficiencies in opposing counsel's tactics and factual account." (*People v. Bemore* (2000) 22 Cal.4th 809, 846 [94 Cal.Rptr.2d 840, 996 P.2d 1152].)

### 6. *Instructional Issues*

Defendant contends the court committed a number of errors in instructing the jury.

He first argues the court did not accurately inform the jury he would be ineligible for parole if the jury returned a verdict of life. The court refused defendant's request to instruct that "Life without the possibility of parole means exactly that and jurors are not to assume anything other than death means death by execution in the gas chamber; life without the possibility of parole means imprisonment for the rest of his natural life." Instead, the court instructed the jury at the outset that its choice of verdicts was "death or confinement in the state prison for life without possibility of parole," and, later, that the jury's duty was "to determine which of the two penalties, death or confinement in the state prison for life without possibility of parole shall be imposed on the defendant."

We see no error. The court's actual instructions were precisely accurate; the jury's choice was indeed between death and life without the possibility of parole. Defendant's requested instruction would have been inaccurate because the Governor has the power to commute a sentence. (*People v. Jones* (1997) 15 Cal.4th 119, 189-190 [61 Cal.Rptr.2d 386, 931 P.2d 960]; *People v. Arias* (1996) 13 Cal.4th 92, 172-173 [51 Cal.Rptr.2d 770, 913 P.2d 980].) Defendant cites United States Supreme Court decisions involving South Carolina law. (*Shafer v. South Carolina* (2001) 532 U.S. 36 [121 S.Ct. 1263, 149 L.Ed.2d 178]; *Simmons v. South Carolina* (1994) 512 U.S. 154 [114 S.Ct. 2187, 129 L.Ed.2d 133]; see also *Kelly v. South Carolina* (2002) 534 U.S. 246 [122 S.Ct. 726, 151 L.Ed.2d 670].) These decisions "are readily distinguishable, in that the juries in those cases were told that the alternative to a death sentence was one of 'life imprisonment' without instruction that a

capital defendant given such a sentence would not be eligible for parole." (*People v. Snow* (2003) 30 Cal.4th 43, 123 [132 Cal.Rptr.2d 271, 65 P.3d 749].) Here, by contrast, the jury *was* informed that a life verdict is without the possibility of parole. Defendant also contends the court's refusal to give his requested instruction was exacerbated because the court sustained an objection when defense counsel started to argue that defendant would never have a parole hearing. Again, this argument would have been inaccurate. In any event, both sides argued, without objection, that a life verdict would mean defendant would die in prison. Indeed, the prosecutor stated that "it should be obvious to you and to everyone in this courtroom that [defendant], based upon your verdict, will die in prison. He either is going to die of old age, or he's going to die in the gas chamber." The jury understood the significance of its choices.

Defendant contends the court prejudicially misspoke in its oral instruction defining "mitigating circumstance." According to the reporter's transcript, the court told the jury "a mitigating circumstance is any fact, condition or event which as such does on [*sic*: it obviously should have been "not"] constitute a justification or excuse for the crime in question but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty." Assuming the mistake was the court's rather than the court reporter's, the jury could not have been confused. It was also provided the instructions in written form, which correctly use the word "not" rather than "on." No reasonable juror would give the instructions the non-sensical meaning that a mitigating circumstance "does on constitute a justification or excuse," rather than the obvious meaning stated in the written form. (*People v. Crittenden* (1994) 9 Cal.4th 83, 138 [36 Cal.Rptr.2d 474, 885 P.2d 887].) Moreover, the important portion of this instruction for defendant was that a mitigating circumstance is anything that "may be considered as an extenuating circumstance in determining the appropriateness of the death penalty." The misstatement did not affect this portion.

In a related contention, defendant claims the court inadequately responded to a jury question. As noted in the previous paragraph, the court gave the standard concluding penalty phase instruction, including that a "mitigating circumstance" is something that "may be considered as an extenuating circumstance in determining the appropriateness of the death penalty." (CALJIC No. 8.88.) During its deliberations, the jury requested to have a "definition of: extenuating circumstance." Outside the presence of the jury, the court and parties discussed how to respond. Defense counsel asked the court to "define extenuating circumstance as mitigation" and to reread the definition in CALJIC No. 8.88 and the instruction regarding section 190.3, factor (k). Instead, the court responded, "The words are to be understood by

their common meaning. Further reference should be made to the jury instructions which you have been furnished." We see no error. Rereading the instructions, as defendant suggested, would have not provided the jury with any information it did not already have. Instead, the court gave the jury the helpful and correct response that the words have their common meaning, not any technical meaning, and referred the jury to the written instructions. This satisfied the court's duty. (*People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1017-1018 [30 Cal.Rptr.2d 818, 874 P.2d 248]; *People v. Beardslee* (1991) 53 Cal.3d 68, 97 [279 Cal.Rptr. 276, 806 P.2d 1311].) In *People v. Lucero* (2000) 23 Cal.4th 692 [97 Cal.Rptr.2d 871, 3 P.3d 248], the court responded to a similar jury request by giving a dictionary definition of the term. We rejected the defendant's argument that doing so was itself error, but we did not suggest the court was required to give this definition. (*Id.* at pp. 723-725.)

The court instructed the jury that evidence had been introduced to show that defendant had committed "battery, false imprisonment, kidnapping, rape, attempted sodomy or oral copulation, robbery, assault with a deadly weapon, and false imprisonment, which involve the express or implied use of force or violence," and that a juror could not consider any crime unless that juror found beyond a reasonable doubt that defendant had committed it. Defendant contends the court erred by not also instructing the jury on the elements of these crimes. However, defendant stated he did *not* request those instructions. The court has no duty to instruct on the elements of other crimes absent a defense request, because the defendant might not want lengthy instructions on those elements. (*People v. Weaver* (2001) 26 Cal.4th 876, 987 [111 Cal.Rptr.2d 2, 29 P.3d 103].) Here, defendant reasonably wanted the court not to itemize the elements of all the other crimes he committed. There was no doubt that those elements were generally present, so focusing on them could only have harmed, not benefited, defendant.

Defendant contends the "court twice improperly instructed the jury to consider 'applicable' mitigating evidence. The inclusion of the word 'applicable' improperly allowed the jury to disregard relevant mitigating evidence if the jury felt the evidence was inapplicable." We disagree. The court did not tell the jury to consider applicable mitigating *evidence*, but to consider the applicable "factors," which it defined. Indeed, the court told the jury to "consider all of the evidence." (CALJIC No. 8.85.)

The court refused a defense requested instruction regarding aggravating circumstances on the basis that other instructions covered it and it was confusing. The court correctly refused to give the instruction. The standard instructions the court gave adequately instructed the jury regarding aggravating circumstances. The requested instruction would have erroneously told

the jury it could not consider "any fact" in aggravation unless it found it true beyond a reasonable doubt. Except for other crimes, about which the court correctly instructed, the penalty jury need not find any fact beyond a reasonable doubt before considering it in aggravation. (*People v. Crittenden, supra,* 9 Cal.4th at p. 153.)

The court refused to instruct the jury that "[m]ercy is a permissible response to defendant's mitigating evidence," and that it could consider "pity, sympathy, or mercy for the defendant" in its penalty verdict. It did not thereby err, especially given the actual instructions which told the jury to consider "any sympathetic or other aspect of the defendant's character or record that the defendant offers . . . ." (See *People v. Lewis* (2001) 26 Cal.4th 334, 393 [110 Cal.Rptr.2d 272, 28 P.3d 34]; *People v. Benson* (1990) 52 Cal.3d 754, 808-809 [276 Cal.Rptr. 827, 802 P.2d 330].)

The court also refused to give three defense-requested instructions regarding the jury's consideration of mitigating and aggravating factors, because they were covered by other instructions and, in part, were argumentative. The refusal was proper because the standard instructions the court gave fully explained the applicable law. Defendant claims that excluding the instructions "led the jury to believe that their sentencing responsibilities could be achieved by a mere counting of the aggravating and mitigating factors." Nothing in the actual instructions, however, would have led the jury to so believe. Indeed, the court told the jury that the "weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale . . . ." (CALJIC No. 8.88.) In part, one of the requested instructions stated, "One mitigating circumstance may outweigh several aggravating circumstances, or one aggravating circumstance may outweigh several mitigating circumstances." We have said that telling the jury that any mitigating factor could outweigh all aggravating factors without stating the reverse was argumentative. (*People v. Seaton, supra,* 26 Cal.4th at p. 689; *People v. Hines* (1997) 15 Cal.4th 997, 1069 [64 Cal.Rptr.2d 594, 938 P.2d 388].) As defendant points out, his requested instruction was not argumentative in this way. But the instruction was still unnecessary in light of the standard instructions the court actually gave. Those instructions provided adequate guidance how to consider the aggravating and mitigating factors.

The court refused defendant's request to instruct the jury that the "absence of premeditation and deliberation is a circumstance in mitigation." Defendant contends the refusal was error. We disagree. As defendant points out, the trial court did give such an instruction in *People v. Bonillas* (1989) 48 Cal.3d 757, 792 [257 Cal.Rptr. 895, 771 P.2d 844]. But we have never

required it. (See *People v. Lucero, supra,* 23 Cal.4th at p. 730.) The court correctly instructed the jury to consider "the circumstances of the crime," and to consider in mitigation "any other circumstance which extenuates the gravity of the crime." These instructions were adequate; reference to specific circumstances was not necessary. Whether any particular circumstance of the crime was aggravating or mitigating was for the parties to argue, not for the court to instruct. (*People v. Catlin* (2001) 26 Cal.4th 81, 173-174 [109 Cal.Rptr.2d 31, 26 P.3d 357].)

 The court refused defendant's request to instruct the jury to disregard his and the victim's racial backgrounds and to require the jurors to sign a certificate stating that they had not considered race in their verdict. Stating that he is Black, and pointing out that his murder victim was Japanese, he argues the court's refusal to so instruct was error. We disagree. The requested instruction was drawn from a federal statute requiring that instruction and certificate in federal capital prosecutions. (18 U.S.C. § 3593(f).) But the instruction is not constitutionally required. Obviously, the jury may not consider the defendant's or victim's race in deciding whether to impose the death penalty. (The jury *was,* however, entitled to consider defendant's own racial epithets as circumstances of the crimes; see p. 626, *ante.*) But the court need not interject the issue of race itself and then tell the jury to disregard it, at least absent some indication the jury might improperly consider race. (See *State v. Roseboro* (2000) 351 N.C. 536 [528 S.E.2d 1, 13].)

 Contrary to defendant's arguments, the court has no sua sponte duty to instruct the jury not to draw adverse inferences from his failure to testify at the penalty phase (*People v. Holt* (1997) 15 Cal.4th 619, 687 [63 Cal.Rptr.2d 782, 937 P.2d 213]); use of the word "extreme" in instructing the jury on section 190.3, factor (d), was not error (*People v. Jenkins* (2000) 22 Cal.4th 900, 1054-1055 [95 Cal.Rptr.2d 377, 997 P.2d 1044]); and the court did not have to tell the jury that factors in mitigation need not be found unanimously (*People v. Breaux* (1991) 1 Cal.4th 281, 314-315 [3 Cal.Rptr.2d 81, 821 P.2d 585]).

E. Denial of Modification Motion

 Defendant contends the court erred in denying his automatic motion to modify the verdict. (§ 190.4.) "In ruling on the motion, the trial court must independently reweigh the evidence of aggravating and mitigating factors presented at trial and determine whether, in its independent judgment, the evidence supports the death verdict. The court must state the reasons for its ruling on the record." (*People v. Steele* (2002) 27 Cal.4th

1230, 1267 [120 Cal.Rptr.2d 432, 47 P.3d 225].) In this case, the court's preliminary remarks show it understood this duty precisely. The court also stated detailed reasons for denying the motion.

Defendant argues the court erred in two ways. First, after thoroughly analyzing the statutory factors and the evidence, the court stated "that the defendant is unable to live in any society, even with a structured society of prison, without being a substantial threat to the safety, lives of others who he comes in contact with." Defendant argues that this language shows "the court failed to base its decision on whether the jury's verdict was contrary to the law or evidence presented." On the contrary, the court's discussion as a whole made clear it did apply the correct test. Indeed, it expressly found that the jury's verdict was "certainly supported by the weight of the evidence presented." The court's finding of future dangerousness was based solely on the evidence presented at trial and was thus proper. (See *People v. Ray, supra,* 13 Cal.4th at p. 353 [prosecutor may argue future dangerousness if based on the evidence].) Second, defendant contends the court "improperly ignored facts in mitigation." It did not do so. It *considered* all of the evidence offered in mitigation; it merely found that much of that evidence did not, in fact, mitigate in light of the evidence as a whole. Doing so was entirely proper. (*People v. Steele, supra,* 27 Cal.4th at pp. 1267-1268.) The court was also entitled to make credibility determinations. (*People v. Proctor* (1992) 4 Cal.4th 499, 555 [15 Cal.Rptr.2d 340, 842 P.2d 1100].)

"In short, the court carefully and conscientiously performed its duty under section 190.4." (*People v. Steele, supra,* 27 Cal.4th at p. 1268.)

F. Disproportionate Punishment

 Defendant contends the death sentence is cruel or unusual and thus violates California Constitution, article I, section 17. In deciding this question, a reviewing court must examine the circumstances of the offense as well as the defendant's personal characteristics. The court must invalidate the sentence if it finds the death penalty grossly disproportionate to the defendant's individual culpability, that is, if the punishment shocks the conscience and offends fundamental notions of human dignity. (*People v. Hines, supra,* 15 Cal.4th at p. 1078.)

The sentence of death in this case is not cruel or unusual. Defendant accosted a helpless, lone young woman, a guest in this country, shortly after she got off a bus, forced her at gunpoint to a lonely spot, raped her, and shot her to death. His stabbing of a woman in an apartment complex laundry room two months earlier, also unprovoked and without warning, could easily

have been another murder. These crimes were but part of a long reign of terror, in which he victimized young girls as well as adults, and preyed repeatedly on students at a local high school.

Defendant argues that after he shot Ai Toyoshima he "exhibited tremendous feelings of remorse," said "he hoped she wouldn't die," called "her residence to tell her host parents where to find her," "suffer[ed] months of depression, weight loss, sleep deprivation, thoughts of suicide," and "constantly prayed for her." Before he killed her, he says, he was "under tremendous pressure." The telephone call to the host family and other factors defendant cites were certainly mitigating circumstances for the jury to consider. But even if we assume the best for defendant—that he meant only to rape this victim, as he had raped others, and not to kill her—this assumption does not *compel* a life sentence. Even if the jury, or we, were to take defendant's protestations at face value and conclude he was truly remorseful that he had fatally shot his young, terrified victim, and that he had hoped she would survive his onslaught, the jury could also reasonably conclude that this hope and this remorse were not enough. Sometimes crimes are so heinous (and, here, so repeated) that saying one is sorry afterwards, even sincerely, is simply not enough.

Defendant's claim that his shooting was accidental rings exceedingly hollow. He selected a *loaded* gun as his weapon. If, as he claimed, he used the gun merely to gain power over his victim, rather than shoot her, he did not have to load it. Defendant is fully responsible for his actions; his repeated, deliberate criminal acts fully warrant the death sentence he faces today. The jury's verdict does not shock the conscience. The death sentence is not disproportionate to defendant's personal culpability.

G. Other Contentions

Defendant reiterates many contentions we have already rejected. The death penalty law does not impermissibly allow the jury to triple-count the underlying rape and kidnapping as bases for first degree murder, special circumstances, and aggravating circumstances. (*People v. Seaton, supra,* 26 Cal.4th at pp. 690-691; *People v. Gates* (1987) 43 Cal.3d 1168, 1188-1190 [240 Cal.Rptr. 666, 743 P.2d 301].) California's death penalty law adequately narrows the class of death-eligible defendants. (*People v. Burgener* (2003) 29 Cal.4th 833, 884 & fn. 7 [129 Cal.Rptr.2d 747, 62 P.3d 1].) Section 190.3, factor (a), is not impermissibly vague. (*People v. Mendoza* (2000) 24 Cal.4th 130, 192 [99 Cal.Rptr.2d 485, 6 P.3d 150].) Failure to require written findings, unanimity as to aggravating circumstances or findings beyond a reasonable doubt (except for other crimes), to impose a

penalty phase burden of proof, or to conduct intercase proportionality or disparate sentence review does not invalidate the death penalty. (*People v. Carpenter, supra,* 15 Cal.4th at pp. 417-418, 420-421; *People v. Crittenden, supra,* 9 Cal.4th at pp. 156-157.) Introducing evidence of unadjudicated criminal activity at the penalty phase is not unconstitutional. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 507 [117 Cal.Rptr.2d 45, 40 P.3d 754].) Use of the word "extreme" in section 190.3, factors (d) and (g), and "substantial" in section 190.3, factor (g), does not impermissibly restrict the jury's consideration of mitigating factors. (*People v. Jenkins, supra,* 22 Cal.4th at pp. 1054-1055.)

Defendant argues that a number of these conclusions are incorrect in light of *Ring v. Arizona* (2002) 536 U.S. 584 [122 S.Ct. 2428, 153 L.Ed.2d 556] and *Apprendi v. New Jersey* (2000) 530 U.S. 466 [120 S.Ct. 2348, 147 L.Ed.2d 435]. However, those cases do not affect California's death penalty law. (*People v. Prieto* (2003) 30 Cal.4th 226, 262-263, 271-272 [133 Cal.Rptr.2d 18, 66 P.3d 1123]; *People v. Snow, supra,* 30 Cal.4th at p. 126, fn. 32.)

## III. CONCLUSION

We affirm the judgment.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Brown, J., and Moreno, J., concurred.

Appellant's petition for a rehearing was denied July 16, 2003. Brown, J., did not participate therein.