Filed 3/21/25  P. v. Germany CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C100063 |
| Plaintiff and Respondent, | (Super. Ct. No. 22FE003389) |
| v. | |
| BRANDON MONEZ GERMANY, | |
| Defendant and Appellant. | |

After a single-car accident left two men dead, a jury determined that defendant Brandon Monez Germany was the driver of the car and that he drove under the influence of alcohol, rejecting the defense theory that he was merely a passenger.  Accordingly, the jury found Germany guilty of two counts of murder and other crimes.  Before the jury reached its verdicts, Germany unsuccessfully asked the trial court to appoint a new defense attorney, claiming, among other things, that his attorney had failed to investigate the facts and develop the evidence as Germany desired and had called him a racial slur.

1

On appeal, Germany contends the trial court (1) abused its discretion by denying his requests to substitute appointed counsel (see *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*)) without conducting an adequate inquiry into his concerns about counsel's racial bias; (2) erred under the California Racial Justice Act of 2020 (RJA) (Stats. 2020, ch. 317) by failing to conduct that adequate inquiry, which should have considered counsel's unconscious bias; and (3) erred at sentencing by denying his request under *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 to strike a prior strike offense pursuant to Penal Code[1] section 1385, subdivision (a), and by failing to strike the prior strike under section 1385, subdivision (c), as recently amended by Senate Bill No. 81 (2021-2022 Reg. Sess.) (Senate Bill No. 81) (Stats. 2021, ch. 721, § 1).  We affirm.

BACKGROUND

Just before 3:00 a.m. one day in February 2022, a California Highway Patrol (CHP) officer found Germany trapped in the driver's seat of a "wrecked" BMW near a highway on-ramp.  He appeared dazed, was bleeding from significant facial lacerations, and seemed to be calling out to his two cousins, who had died in the crash.  A blood test revealed Germany had a blood-alcohol level of approximately 0.27—more than three times the legal limit.

In an October 2022 amended information, Germany was charged with two counts of second degree murder (§ 187, subd. (a)) and two counts of gross vehicular manslaughter while intoxicated (§ 191.5, subd. (a)).  The information also alleged that Germany had prior driving under the influence (DUI) convictions in 2013 and 2021 for unlawfully driving a vehicle with a blood-alcohol level of 0.08 percent or more (Veh. Code, § 23152, subd. (b)), and further alleged that Germany had a 1998 robbery

---

[1] Undesignated statutory references are to the Penal Code.

2

conviction (§ 211), a serious felony within the meaning of California's "Three Strikes" law (§§ 667, subds. (b)-(i), 1170.12).

In March 2023, Germany made his first unsuccessful request to substitute appointed defense counsel.

I

*Second Marsden – May 2023*

A.      *Germany's Contentions*

Germany made his second *Marsden* motion in May 2023, alleging that counsel "did nothing that [he] asked for." Germany explained: "I asked him to give me the time stamps for the pictures" of the scene of the accident. "He gave me pictures with no time stamps. I asked for DNA forensic on the vehicle that we were in." "I asked for certain witnesses."

Regarding those witnesses, Germany asserted that (a) a fireman would testify that he was in the passenger seat, not the driver's seat; (b) a medical doctor from the county jail who cleared him for placement in the general jail population would confirm that his injuries from the accident were consistent with being in the passenger seat; (c) a medical doctor from UC Davis who treated him after the accident would state that his "seat belt scars" aligned with being in the passenger seat; and (d) family members who attended the party he left just before the February 2022 car accident would testify that he was not driving.

Germany further contended that "yesterday was the first time that [counsel] came to see [him] for two hours in 15 months." Germany told counsel: "[Y]ou didn't do nothing that I asked for. You haven't even got all my full discovery. None of that. When he walked out, he mumbled something under his tongue. . . . I know it was a racial slur." Germany asserted, "[H]e called me a stupid nigga." Additionally, Germany stated that one of counsel's former clients had provided him with an "affidavit" that he wanted to present to the trial court but had not shown to counsel. The trial court reviewed the

3

document, which appeared to have been created the day before the hearing, and alleged that counsel called the former client an "ignorant nigger."[2]

Germany also maintained that counsel told his family that he would secure his release from custody pending trial and have his prior felony stricken. Germany further insisted that he "need[ed] better counsel," explaining that his attorney had represented two other people "in custody since [Germany had] been in custody . . . and they got 25-to-life. And I'm scared. I don't want 25-to-life for something I didn't do."

B.     *Trial Court's Initial Questions and Comments*

When the trial court asked if Germany knew the names of people who attended the February 2022 party that he wanted counsel to contact, he initially replied that he did not but then named one person. The trial court then asked counsel, "Is this the first time you are hearing this name, [counsel]?" Counsel replied, "Yes." He then explained that he and his investigator had repeatedly asked Germany and his family members "for any witnesses, anything having to do with the party that may know anything or be willing to talk to us," but they were "met with nothing but complete refusals to give us any information, any names."

Regarding Germany's fear of receiving a lengthy prison sentence, the trial court clarified that he faced an aggregate term of 60 years to life due to his prior strike conviction. The court noted that Germany's counsel had "practiced . . . in front of" her for many years. The trial court then explained to defendant, "He will file a motion to strike your prior conviction. So even if your conviction was struck, you would be looking at 30-years-to-life on this case."

---

[2] Contrary to the People's contention, this document is part of the record on appeal.

4

The trial court observed that the reason Germany had met other clients of his counsel who faced lengthy prison sentences was because counsel was "such an experienced attorney that he only handles big cases. He doesn't handle misdemeanors." The court added, "It's just the nature of the profession. Once you reach a certain point, you start handling more serious cases."

In response to the trial court's questions, counsel stated that he had completed approximately 50 to 60 jury trials over his 25 years of practicing criminal law and began representing Germany in March 2022.

C.     *Counsel's Responses to Germany's Contentions*

Counsel responded that the absence of time stamps on the accident scene photographs was not a concern because it was indisputable that first responders took the photographs upon arrival; DNA and forensic evidence was immaterial to Germany's desired defense, as it was undisputed that three people were in the car, all of whom left substantial amounts of blood; and regarding witnesses, there were no medical records from UC Davis or the county jail indicating Germany was a passenger, and Germany consistently refused to provide the names of anyone who attended the February 2022 party. Counsel further stated that, contrary to Germany's claims, he had met with Germany numerous times over the previous 15 months, including three weeks before the hearing.

Counsel also denied calling Germany " 'a stupid' N-word," describing the allegation as "shocking" and "completely fabricated," and characterized as fabricated the document from a former client alleging that he had used a racial slur. Finally, counsel clarified that he had never told Germany or his family that he would have the prior felony stricken or secure Germany's release pending trial but had stated he would file a motion to strike the prior felony at the appropriate time.

D.     *Further Discussion Between the Trial Court, Germany, and Counsel*

In connection with Germany's contention that counsel had said he would get Germany out of custody pending trial and have his prior felony stricken, the trial court asked counsel, "[W]hat do you think the chances are that Mr. Germany would be able to get out of custody pending these types of charges?" Counsel replied: "I don't see really any possibility . . . ." The trial court responded: "You have been practicing in this community for many years and you know generally what the culture is here and how we proceed with trials of this nature. Is it your experience that people who are facing murder cases where there are two decedents, whether it be vehicular manslaughter with gross negligence or second degree murder, are going to get released?" Counsel replied: "No. Never. And Mr. Germany has asked me numerous times to address bail. I said no, it doesn't make sense. It's a futile argument. Quite frankly, I said the Court would be upset . . . with me if I did."

In connection with Germany's concerns that counsel failed to contact certain witnesses, the trial court observed that Germany had named potential witnesses for the first time during the *Marsden* hearing. Later, the trial court posed the following question to counsel: "If you don't have the names of witnesses, are you able to investigate it?" Counsel replied: "No. . . . And again, we've repeatedly, repeatedly, repeatedly asked, tried to help Mr. Germany, anyone we can talk to that might know something." Germany insisted that his family was angry with him and did not want to "get involved." The trial court then asked Germany: "[D]o you see the quandary you've put your own lawyer in?" "How is he supposed to do the investigation?" Germany replied: "That's my fault for that. . . . I will accept all of that. But . . . I asked for, video cameras, body-worn cameras." The trial court explained that CHP officers did not wear body cameras when the crash occurred.

E.      *Denial of Motion and Additional Comments*

At the end of the hearing, the trial court said, "[A]t this point in time, I am prepared to deny your Marsden motion." The court added that it did not believe counsel was a racist: "I think that is a very ugly accusation to make. I have known [counsel] for years. He has an exceptionally good reputation in the legal community and amongst the judges in this courthouse. I have never heard that accusation, not even once." In response, Germany referenced the document from counsel's former client alleging the use of a racial slur. The trial court replied: "Whatever he says, he says. But I will tell you this: I accept [counsel's] representation on this. I have never heard this said of [counsel]. Never. That is not his reputation." Germany insisted he heard counsel use the racial slur the day before. The trial court replied, "You can believe that, but I'm telling you to the extent that there is a discrepancy between your version and [counsel's] version . . . ." Germany interrupted: "There is a discrepancy through this whole . . . . He has not been doing what I asked." The trial court responded, "I think this hearing speaks for itself, so I'm going to deny the Marsden motion and find that [counsel] has properly represented you. He will continue to properly represent you."

II

*Additional Procedural Background*

*Third Marsden*

In June 2023, the trial court sought to help the parties resolve the case before jury selection. The prosecutor insisted that he would accept nothing less than a 30-year-to-life sentence for Germany. The trial court confirmed with Germany that he understood he faced a term of 60 years to life and did not want to accept the prosecution's offer of 30 years to life. Germany then made another *Marsden* motion.

7

In the closed hearing, Germany insisted that he was not the driver of the car that crashed and asserted, among other things, that there was "a lot of tampering with evidence in [his] case, so it's . . . insufficient counsel." After further discussion with Germany and counsel, the trial court denied this third *Marsden* motion.

*Trial*

At trial, Germany testified in his own defense, maintaining that when he left the party in the BMW, he sat in the front passenger seat and fell asleep. When he woke up, he was being pulled out of the BMW. Someone walked him around to the driver's seat and had him sit down in it. He explained that this was why there were photographs of him in the driver's seat after the accident.

During jury deliberations, the following colloquy occurred in another closed *Marsden* hearing:

"THE COURT: Mr. Germany, during the course of these proceedings, a couple times you have made Marsden motions, and I know that there were things that were said in the heat of the moment, at least during one Marsden motion, and I want to give you the opportunity to set the record straight as far as that is concerned, sir. [¶] Are you willing to do that?

"[GERMANY:] Yes.

"THE COURT: Go right ahead.

"[GERMANY:] I apologize for accusing [counsel] of calling me a bad name.

"THE COURT: Because he didn't do it?

"[GERMANY:] No, he didn't.

"THE COURT: Do you accept that, [counsel]?

"[COUNSEL:] I do, Your Honor, and I appreciate the apology.

"THE COURT: All right. Thank you, Mr. Germany."

*Jury Verdicts*

The jury found Germany guilty of two counts of second degree murder and two counts of gross vehicular manslaughter while intoxicated, and found true the related allegations concerning Germany's DUI convictions in 2013 and 2021.

*Fourth Marsden*

Germany made a fourth *Marsden* motion before sentencing. The trial court denied it.

DISCUSSION

I

*No Marsden Error*

Germany contends that the trial court abused its discretion by failing to conduct an adequate inquiry into his concerns regarding counsel's racial bias, instead relying solely on counsel's reputation and prior courtroom performance to deny the second *Marsden* motion in May 2023. He maintains that the trial court should have conducted further inquiry into (1) why Germany claimed counsel used a racial slur, (2) the impact of his allegations regarding counsel's use of racial slurs on his trust in and relationship with counsel, and (3) why he later retracted the allegation. He argues that if an adequate inquiry had revealed his concerns to be well-founded, the appointment of new counsel would have been appropriate.

We are not persuaded. The record reflects that the trial court denied the second *Marsden* motion on credibility grounds after a thorough hearing. To assuage Germany's dissatisfaction with counsel, the court then shared its understanding of counsel's qualifications and experience.

A.     *Legal Background*

To protect a criminal defendant's Sixth Amendment right to the assistance of court-appointed counsel, if a defendant seeks to replace appointed counsel on the grounds of inadequate representation, the trial court must permit the defendant to explain the basis

of the contention and provide specific examples of inadequate performance. A defendant is entitled to relief if the record clearly shows that the first appointed attorney is not providing adequate representation or that the defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result. (*People v. Smith* (2003) 30 Cal.4th 581, 604 (*Smith*); *Marsden*, *supra*, 2 Cal.3d at pp. 123-124.)

A defendant may not force the substitution of counsel by manufacturing a conflict. A claimed lack of trust in, or inability to get along with, appointed counsel is, by itself, insufficient to compel the appointment of substitute counsel. The right to appointed counsel encompasses neither a "veto" power over an appointment nor the right to appointment of one's preferred attorney. (*Smith*, *supra*, 30 Cal.4th at p. 606; *Marsden*, *supra*, 2 Cal.3d at p. 123.)

We review the trial court's ruling for an abuse of discretion. (*Smith*, *supra*, 30 Cal.4th at p. 604.) In conducting that review, we consider whether the trial court "made an adequate inquiry into the defendant's complaints." (*People v. Mungia* (2008) 44 Cal.4th 1101, 1128.) We presume the trial court's *Marsden* denial was correct. (*People v. Davis* (2023) 87 Cal.App.5th 771, 779 [appellate courts presume the trial court's judgment is correct].)

A trial court's *Marsden* ruling may rest on credibility findings. (*People v. Smith* (1993) 6 Cal.4th 684, 696 [the trial court was entitled to accept counsel's explanation in resolving a "credibility question between defendant and counsel" at the *Marsden* hearing]; cf. *People v. Coleman* (2024) 98 Cal.App.5th 709, 722 [rejecting an RJA claim and explaining that the trial court "credited defense counsel's statement" in resolving a factual dispute at a *Marsden* hearing concerning what counsel said to the defendant].)

10

B.    *Analysis*

Here, the trial court listened to Germany's numerous contentions of ineffective representation, including the racial slur allegations.  The court probed the details of Germany's contentions, asking follow-up questions and making comments.  Then, relevant here, after finding counsel's denials of using a racial slur credible, the trial court concluded that Germany's reasons for seeking new counsel lacked merit.  This decision was not an abuse of discretion.  (See *Smith*, *supra*, 30 Cal.4th at pp. 606-608 [no abuse of discretion where the trial court "allowed defendant to express himself fully," " 'listened to defendant's reasons for desiring new counsel, and found them to be without merit' "]; *In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1043 ["Only the trial judge as a trier of fact is in a position to separate the truth from the exaggeration, sometimes revealed by things like verbal hesitancy and body language which are not picked up in a reporter's transcript"].)

That the trial court mentioned counsel's reputation and experience after denying the *Marsden* motion does not indicate that the denial was based on those notions.[3] (Cf. *People v. Contreras* (2013) 58 Cal.4th 123, 154 ["Notwithstanding any inartful language used to describe its ruling, the court properly exercised such discretion here"].) To the contrary, the record suggests that the trial court mentioned counsel's reputation and experience in a continuation of its attempt to assuage Germany's dissatisfaction with

---

[3]  The People cite *People v. Cole* (2004) 33 Cal.4th 1158, 1192, for the proposition that in making credibility determinations at a *Marsden* hearing, a trial court may rely in part on its knowledge of defense counsel and counsel's reputation in the legal community. Germany does not dispute this characterization of *Cole*.  Rather, he contends *Cole* is distinguishable because, in this case, the trial court relied *solely* on counsel's reputation when making its credibility ruling and denying the second *Marsden* motion.  However, in light of our conclusion that the trial court mentioned counsel's reputation to assuage Germany's dissatisfaction with counsel, we need not resolve the parties' dispute regarding the meaning of *Cole*.

counsel.  (Cf. *Clark v. Broomfield* (9th Cir. 2023) 83 F.4th 1141, 1155-1156 [in addition to providing a sufficient basis for making an informed decision about whether new counsel should be appointed, a trial court's inquiry into counsel's performance during a motion to substitute counsel "should amount to 'such necessary inquiry as might ease the defendant's dissatisfaction, distrust, and concern' "]; *United States v. Iles* (6th Cir. 1990) 906 F.2d 1122, 1131 ["An inquiry into whether the substitution of counsel is warranted serves several important goals," including "eas[ing] the defendant's distrust"].)

For example, in relation to Germany's fear that he would simply be next in a line of counsel's clients sentenced to long prison terms, the trial court sought to provide necessary context: counsel had those clients because he was "such an experienced attorney that he only handles big cases.  He doesn't handle misdemeanors."  Later, in connection with Germany's contention that counsel had promised to secure his pretrial release from prison, the trial court asked counsel if, in light of his "many years" practicing criminal law and his knowledge of "what the culture is here and how we proceed with trials of this nature," there was any chance that someone "facing murder cases where there are two decedents, whether it be vehicular manslaughter with gross negligence or second degree murder" would be granted pretrial release on bail.  Counsel replied, "No.  Never."  Finally, in connection with Germany's concerns that counsel had failed to contact certain witnesses, the trial court observed that Germany had named potential witnesses for the first time during the *Marsden* hearing and asked Germany if he understood the difficult position he had put counsel in by not providing names earlier. Germany responded, "That's my fault for that . . . .  I will accept all of that."

Germany cites no authority for the proposition that a trial court has a duty at a *Marsden* hearing to conduct further inquiry into *why* a defendant has made an allegation

or why the defendant may have retracted it.[4]  Such a duty would be inconsistent with case law recognizing that criminal defendants must raise and articulate their own *Marsden* motions, and cautioning trial courts not to interfere with the attorney-client relationship. (See *People v. Wilson* (2023) 14 Cal.5th 839, 864 ["the burden is ultimately on the defendant to articulate his request" to substitute counsel, and while "the trial court has an obligation to make a clear record and give a defendant the necessary latitude to request the remedy being sought," it "must take care not to interfere with the attorney-client relationship"]; *People v. Martinez* (2009) 47 Cal.4th 399, 421-422 ["the trial court is not required to conduct a *Marsden* hearing on its own motion," and "any obligation" a trial court has to "uphold a proper standard of representation by appointed counsel" "is circumscribed and must be understood in light of the countervailing duty of the court to respect the inviolability of the attorney-client relationship"].)

Having failed to cite any authority to support his argument, and having found none, we further determine that the trial court had no duty to conduct further inquiry into the impact of Germany's allegations regarding counsel's use of racial slurs on his trust in and relationship with counsel.  (See *Smith*, *supra*, 30 Cal.4th at p. 606 [a criminal defendant may not force the substitution of counsel by manufacturing a conflict].)  Accordingly, the trial court did not abuse its discretion when it denied the second *Marsden* motion.

## II

*Further Inquiry Under Marsden in Conjunction with the RJA*

Germany contends that the RJA required further scrutiny into whether counsel exhibited racial bias or animus against him by making one or both racial slurs.  He contends that, even if counsel did not make the slurs, a question remains as to whether

---

[4] Appellate counsel questions whether Germany was "simply acquiescing to defense counsel and the court by subsequently saying it did not happen and apologizing."

13

counsel had "nonetheless unintentionally or unconsciously displayed any sort of implicit bias during representation which affected [Germany's] perception of the proceedings." Germany maintains that such unconscious bias may have "pervaded the proceedings and informed each of" his *Marsden* motions. We are not convinced.

A.    *Legal Background*

While "all persons possess implicit biases" (Stats. 2020, ch. 317, § 2, subd. (g)), the Legislature enacted the RJA to eliminate racial bias, including the unconscious variety, from California's criminal justice system (Stats. 2020, ch. 317, § 2, subd. (i) ["racism in any form or amount, at any stage of a criminal trial, is intolerable" and "inimical to a fair criminal justice system," and "[i]mplicit bias, although often unintentional and unconscious, may inject racism and unfairness into proceedings similar to intentional bias"]). The RJA includes four categories of conduct that, if proven, establish a violation. (§ 745, subd. (a)(1)-(4).) Relevant here, it is an RJA violation if: "(1) . . . an attorney in the case . . . exhibited bias or animus towards the defendant because of the defendant's race." (§ 745, subd. (a)(1).)

B.    *Analysis*

Germany contends section 745, subdivision (a)(1) required the trial court to conduct "further, careful scrutiny" into whether counsel may have unconsciously displayed implicit bias towards Germany, and whether that implicit bias may have affected Germany's perception of the proceedings. We disagree. Generally, trial courts in our adversarial system do not have a duty to consider issues that the parties themselves do not raise. If the Legislature wants to impose a sua sponte duty on the trial courts, it knows how to do so. (See *People v. Banner* (2022) 77 Cal.App.5th 226, 234 ["the Legislature clearly did not mandate courts to sua sponte consider mental health diversion in every case," because "[i]t could have simply included such a requirement in the statute if that was its intent"].) The text of section 745, subdivision (a)(1) simply does not

contemplate imposition of a sua sponte duty on the trial courts to inquire about the unconscious implicit bias of appointed defense counsel.

Though Germany references uncodified legislative findings in the RJA's preamble (see Stats. 2020, ch. 317, § 2), we discern no argument in his briefing that those findings should affect our construction of section 745, subdivision (a)(1). Accordingly, Germany's hybrid *Marsden*/RJA claim is unpersuasive.[5]

### III

### *Sentencing Claims*

Germany contends the trial court erred by declining to strike his prior strike (the 1998 robbery conviction) pursuant to section 1385, subdivision (a), and section 1385, subdivision (c), which was recently amended by Senate Bill No. 81. Regarding the section 1385, subdivision (a) analysis, he contends the trial court abused its discretion by confusing some of the facts of his two DUI convictions, and appearing to have an incorrect understanding of when he will be eligible for parole. Regarding section 1385, subdivision (c), he contends a different panel of this court wrongly held in *People v. Burke* (2023) 89 Cal.App.5th 237 (*Burke*) that a prior strike is not a type of punishment for which one can obtain relief under the statute. *Burke* was not wrongly decided, and the trial court did not abuse its discretion regarding the interests of justice analysis under section 1385, subdivision (a).

---

[5] In support of his argument, Germany invokes a statement signed by two justices of our Supreme Court concurring in the denial of a petition for review, which articulates the view that it would have been "appropriate—perhaps even required—for the court to construe" a defendant's *Marsden* motion and argument "as raising an RJA claim" in that case. (*People v. Coleman*, *supra*, 98 Cal.App.5th at p. 725c (conc. stmt. of Evans, J.).) However, this concurring statement is not binding precedent. Furthermore, the concurring statement emphasized that, when considering the criminal defendant's *Marsden* motion, the trial court did *not* ask counsel "whether she made the specific statements [the defendant] alleged." (*Ibid.*) In contrast, here, the trial court did ask counsel if he made the racial slurs, counsel denied it, and the trial court believed him.

A.	*Additional Background*

1.	*2013 Statement to a Police Officer*

At trial, the police officer who arrested Germany in connection with his 2013 DUI conviction testified that Germany told him he "almost died" and "barely" escaped from his severely damaged car that was on fire when the two men spoke.

2.	*Prior Strike and Romero Motion*

In a bench trial after the jury's verdicts, the trial court found true the allegation that Germany was convicted of robbery in 1998, a serious felony under California's Three Strikes law.

Defense counsel asked the trial court to dismiss the prior strike pursuant to section 1385, subdivision (a), and *Romero*, arguing in his filing that Germany fell outside the spirit of the Three Strikes law because he committed the offense as a teenager, more than 25 years before his instant offenses. Among other arguments, counsel urged the trial court to consider the trauma Germany experienced as a child: he grew up without a parental figure, lacked stability after his father abandoned him when he was seven years old, and he witnessed a family member being shot when he was 15 years old.

At the beginning of the December 2023 hearing at which Germany was sentenced, the trial court confirmed with the parties that Germany was on probation for DUI when he committed the instant offense. Defense counsel reiterated points he made in the filed *Romero* motion and argued that if the trial court struck the prior strike, Germany still would face a sentence of 30 years to life.

The trial court denied the *Romero* motion, emphasizing Germany's near-death experience in 2013, and that he was on probation for DUI when he committed the instant offense: "[T]he jury heard about" the DUI "in which his car actually caught on fire and he almost -- he himself almost died. That was quite jarring testimony to hear about, and it's something that I have to consider, because you would think an individual who had such a close brush with death would stop drinking at that point in time." Germany

16

"[n]ever committed another violent or serious offense." But he still "engaged in extremely reckless and dangerous conduct, and I decline to exercise my discretion to strike his prior conviction because he was on probation for driving under the influence when he engaged in this conduct." He "*was almost seriously injured on the case on which he was on probation.*" "I just cannot turn a blind eye to what occurred, not just in 2013 with this prior conviction for driving under the influence, but also in 2021 for which he was on probation when he committed this offense. So for all of those reasons, I am going to deny" the *Romero* motion. (Italics added.)

> 3. *Imposition of Sentence and Other Remarks*

After denying the *Romero* motion and before pronouncing the sentence, the trial court invited the victims' family members who were in the courtroom to speak. They declined.

The trial court sentenced Germany to an aggregate term of 60 years to life, consisting of consecutive terms of 30 years to life for the two murder convictions (two terms of 15 years to life, each doubled due to the prior strike). The court imposed and, pursuant to section 654, stayed terms for the vehicular manslaughter convictions. The trial court also ordered Germany to pay restitution to the families of his two deceased victims in an amount to be determined, remarking it was more important for the families to receive restitution for counseling and funeral services: "I would prefer to have the family get that restitution as opposed to any fines to the State of California."

The trial court then confirmed Germany's custodial credits with the courtroom clerk, and remarked: "Mr. Germany, it is possible that you will get paroled. . . . For instance, there is something called elder parole. That means if you are 50 years of age and you have served 20 years in prison, the Department of Corrections can parole you under the elder parole provisions, so that could indeed apply to Mr. Germany when he has been incarcerated for 20 years. [¶] I say that to the people seated in the audience today because I know as you leave here today you think Mr. Germany may never get out

17

of prison. That is not necessarily correct. He could very well be released from prison and I think you deserve to know the truth of that."

### B. *Analysis of the Romero Denial*

Under section 1385, subdivision (a) the trial court "may, . . . in furtherance of justice, order an action to be dismissed." This authority under section 1385, subdivision (a) includes the power to "strike or vacate an allegation or finding under the Three Strikes law that a defendant has previously been convicted of a serious and/or violent felony . . . ." (*People v. Williams* (1998) 17 Cal.4th 148, 158.)

We review for an abuse of discretion a trial court's denial of a *Romero* motion asking it to strike a prior strike under section 1385, subdivision (a). A defendant must show that the denial was irrational or arbitrary. (*People v. Carmony* (2004) 33 Cal.4th 367, 375, 378.) It is not enough that reasonable people disagree about whether to strike a prior conviction. The Three Strikes law "not only establishes a sentencing norm, it carefully circumscribes the trial court's power to depart from this norm." (*Id*. at p. 378.) Only extraordinary circumstances justify finding that a career criminal is outside the Three Strikes law. (*Ibid*.) The purpose of the Three Strikes law is to punish recidivists more harshly. (*People v. Avila* (2020) 57 Cal.App.5th 1134, 1140.)

Here, the trial court properly considered the unique circumstances of Germany's reckless and fatal conduct. Germany's 2013 DUI conviction and associated near-death experience and being on probation for a second DUI conviction when he committed the instant offenses were both relevant recidivism considerations when the trial court decided he did not fall outside the spirit of the Three Strikes law. Accordingly, the *Romero* denial was not irrational, and the trial court did not abuse its discretion.

Germany was on probation in 2022 because of his 2021 DUI. And the testimony at trial was that Germany narrowly escaped death in connection with the 2013 DUI conviction. Thus, it appears the trial court misspoke when it said Germany "was almost seriously injured *on the case on which he was on probation*." But considering the totality

of the trial court's comments at the December 2023 hearing, it is clear the trial court understood the material facts and circumstances of Germany's situation when it denied the *Romero* motion: Germany had two prior DUI convictions, he knew that he almost died in connection with one, and he was on probation for a DUI when he committed the instant offenses.

Germany observes that the trial court also appeared to misspeak when it indicated it was possible Germany would be eligible for elderly parole, because a person sentenced under the Three Strikes law is ineligible for such parole. (See § 3055, subds. (a), (g) [under the Elderly Parole Program, the Board of Parole Hearings reviews the parole suitability of inmates who are over 50 years old and have served a minimum of 20 years of continuous incarceration on the inmate's current sentence; but the program does not apply to cases in which sentencing occurs pursuant to the Three Strikes law].) He contends this apparent misunderstanding may have "compounded the court's flawed analysis" in denying the *Romero* motion. We disagree.

As the People note, the trial court made this comment after it had already denied the *Romero* motion and imposed sentence. It also made the comment after expressing hope that the victims' families would be able to use any victim restitution to pay for counseling and funeral services, and before the State of California received payment of any fines from Germany. Further, the trial court indicated that it made the comment for the benefit of the victims' families who were in the courtroom, because they "deserve[d] to know the truth."

Accordingly, the record reflects the trial court referenced the possibility of elderly parole not because it was a factor in its decision to deny the *Romero* motion, but out of solicitude and a sense of responsibility to inform the victims' families that a day might arrive when Germany would be a free man. The trial court did not abuse its discretion in denying the *Romero* motion.

19

C.    *Section 1385, Subdivision (c) and Burke*

Senate Bill No. 81 amended section 1385 to "add specific mitigating factors the trial court must consider when deciding whether to strike enhancements from a defendant's sentence in the interest of justice.  (§ 1385, subd. (c); *People v. Sek* (2022) 74 Cal.App.5th 657, 674.)  Section 1385, subdivision (c) now provides: '(1) Notwithstanding any other law, the court shall dismiss an *enhancement* if it is in the furtherance of justice to do so, except if dismissal of that *enhancement* is prohibited by any initiative statute. [¶] (2) In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances . . . are present.' " (*Burke*, *supra*, 89 Cal.App.5th at pp. 242-243.)

In *Burke*, a different panel of this court explained that because it is "well established that the Three Strikes law is not an enhancement" but "an alternative sentencing scheme for the current offense," (*Burke*, *supra*, 89 Cal.App.5th at p. 243) "section 1385, subdivision (c)'s provisions regarding enhancements do not apply to the Three Strikes law" (*id.* at p. 244).  Germany argues *Burke* was wrongly decided and the trial court should have stricken his prior strike under section 1385, subdivision (c).

No other court that has considered the question has disagreed with the fundamental conclusion in *Burke* applicable here.  (See, e.g., *People v. Olay* (2023) 98 Cal.App.5th 60, 67 ["we . . . agree with *Burke*'s ultimate conclusion—that section 1385, subdivision (c) does not apply to the Three Strikes law"]; *People v. Tilley* (2023) 92 Cal.App.5th 772, 776, fn. 2 [citing *Burke* and reasoning that because a prior strike conviction is "not an enhancement but part of an alternative sentencing scheme," § 1385,

20

subd. (c) does not apply to prior strike convictions].)  Germany's argument is not persuasive.[6]  Accordingly, the trial court did not err at sentencing.

DISPOSITION

The judgment is affirmed.


/s/
BOULWARE EURIE, J.

We concur:


/s/
KRAUSE, Acting P. J.


/s/
WISEMAN, J.[*]

---

[6] This conclusion makes it unnecessary for us to address (1) the People's contention that Germany's section 1385, subdivision (c) argument is forfeited on appeal because it was not raised below, and (2) Germany's contention that, if the argument is forfeited on appeal, counsel provided ineffective assistance.

[*] Judge of the Placer County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.